[No. 38508.    En Banc.    March 14, 1968.]

GORDON S. WOOD, *Appellant*, v. WILLIAM R. MAY, *Respondent.**

*Vincent L. Gadbow* (of *Davies, Pearson, Anderson & Pearson*), for appellant.

*Andrew A. Berilla* and *Frank P. Girolami*, for respondent.

*Reported in 438 P.2d 587.

FINLEY, C. J.—In November 1961 appellant, Gordon S. Wood, a master horseshoer with some 15-years' experience, employed respondent, William R. May, as an apprentice horseshoer. On January 3, 1962 the parties signed a written contract wherein appellant agreed to teach respondent the art of horseshoeing. Respondent agreed that:

[F]or a period of five years from and after the time he shall leave the first party employer, either if by resignation or by discharge, that he shall not engage directly or indirectly in any business or enterprise the nature of which is competitive to the employers business, that is to say he shall not engage in the practice of Horseshoeing or Blacksmithing, within a radius of one hundred (100) miles from the Oakwood Horseshoeing presently situated at Route 1, Box 1491, or any branch of the Oakwood Horseshoeing during the tenure of this time.

The contract further provided that in the event of breach of the agreement not to compete, respondent could be enjoined by a court of equity from engaging in the trade of horseshoeing in the territory and during the time covered by the agreement.

Respondent displayed marked aptitude for horseshoeing, and during the 2 years he worked for appellant he progressed rapidly from the apprenticeship stage. He was soon on his own, so to speak, in shoeing the horses of a substantial number of appellant's customers. Actually, respondent became the only contact appellant had with many of his customers, and these customers gained confidence in respondent's ability as a horseshoer. Consequently, when respondent terminated his employment in March 1964 and immediately set up his own horseshoeing business in Tacoma, 5 miles distance from Spanaway, he secured a substantial number of appellant's customers in Pierce County and on Vashon Island. Appellant began this action to enjoin respondent from engaging in horseshoeing in violation of the agreement.

The bulk of appellant's horseshoeing business was located in Pierce County and on Vashon Island, although he regularly shod a few horses as far north as Lynden, nearly 100 miles from Spanaway.

The trial court dismissed the case at the close of appellant's evidence, finding that although the rest of the contract was reasonable, it was unreasonable to restrict respondent from engaging in horseshoeing within a radius of 100 miles from Spanaway, an area which includes all or part of 22 counties in Washington, and parts of Oregon and Canada. The trial court determined the contract to be indivisible and for that reason refused to modify the restrictive covenants as to time and area.

There are four issues on appeal: (1) are restrictive covenants not to compete after termination of employment void for reasons of public policy? (2) if such covenants are not void, were the covenants in this contract supported by adequate consideration? (3) if supported by adequate consideration, were the restrictions reasonable as to time and areas as to both the parties and the public? (4) if the restrictions were unreasonable, can a court exercising its equity jurisdiction modify such restrictive covenants and enforce them against respondent in a more reasonable manner.

## I.

In *Racine v. Bender,* 141 Wash. 606, 611, 252 Pac. 115 (1927), we recognized the following principles in relation to restrictive covenants in employment contracts:

> The general rule applied in construing such contracts, is that restrictions therein are upheld, if they meet the test of showing that they are not greater than are reasonably necessary to protect the business or good will of the employer, even though they restrain the employee of his liberty to engage in a certain occupation or business, and deprive the public of the services, or restrain trade. [Omitting citation.]

9 A.L.R. 1467, 1468, states the rule as follows:

> "The validity of covenants by employees not to engage in a similar or competing business for a definite period of time, following the termination of the contract of employment in which the covenant is incorporated, may be sustained, although the contract is recognized to be in restraint of trade. The test generally applied in determining the validity of such a covenant is whether or not the restraint is necessary for the protection of the business or

good will of the employer, and, if so, whether it imposes on the employee any greater restraint than is reasonably necessary to secure to the business of the employer, or the good will thereof, such protection, regard being had to the injury which may result to the public, by restraining the breach of the covenant, in the loss of the service and skill of the employee, and the danger of his becoming a charge upon the public.

"It is clear that if the nature of the employment is such as will bring the employee in personal contact with the patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers, enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of or acquaintance with the patrons or customers of his former employer, and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business . . . ."

The restrictive covenants in the instant matter are not void for reasons of public policy. The evidence indicated that there are some 3000 horses in the Pierce County area, and some 8 competent horseshoers residing in the immediate area. Although customers may prefer respondent to other horseshoers in the area, his services are not indispensible. The law presumes that the services can be performed by someone else. *Racine v. Bender, supra,* at 613. And, it was not shown that respondent will not be able to find work as a horseshoer without competing with appellant.

II.

The contract, although somewhat vague and poorly drawn, was supported by adequate consideration. Respondent promised not to compete with appellant upon termination of his employment in return for appellant's promise to teach respondent the skill of horseshoeing. Over the period of 2 years during which the parties operated under the contract, appellant did indeed teach respondent the trade or art of horseshoeing. The evidence showed that there are two methods of becoming a skilled horseshoer. One may

either attend a college course in horseshoeing, followed by experience under a master horseshoer, or he may learn by the apprenticeship method as respondent did in this case. During the 2 years respondent worked for appellant he earned approximately $3800 the first year, and approximately $6500 the second year. After he left appellant's service respondent grossed from $500 to $1800 per month, horseshoeing being somewhat seasonal in nature. Appellant obviously fulfilled his part of the bargain. He taught respondent to be a proficient horseshoer, a trade at which he has been able to earn a good living. This is adequate consideration for a promise not to compete in a trade which involves a unique personal relationship between tradesman and customer.

### III.

The trial court correctly found the area restriction in the contract to be unreasonable. It was correct to refuse to enforce this restriction as written, since it is both unduly harsh to respondent in curtailing his legitimate efforts to earn a livelihood and unnecessary for the protection of the legitimate interests of appellant. *See* 41 A.L.R.2d 314, 43 A.L.R.2d 141. The trial judge found the time restriction to be more acceptable, stating that he felt the time involved was "particularly lengthy," but that "[t]he Court could accept the restriction in terms of five years."

However, on the basis of the evidence presented, we are constrained to believe that the restrictions were probably unreasonable *both* as to area and time. The trial judge felt he was obligated to either accept or reject the restrictions *in toto* rather than to modify them on the basis of his factual findings. We do not believe he could properly decide the issues before him while operating under this assumption. We are granting a new trial in this matter so that reasonable restrictions upon respondent's competitive activities, both as to time and area, can be determined and imposed. We note in passing that counsel for appellant admitted in oral argument that an area of 25-miles radius from Spanaway would be reasonable. This court approved a restrictive period of 3 years in the *Racine* case, *supra*.

But we offer no suggestion without more evidence than the record reveals whether a period of 1 year, 3 years or some other period of time is reasonable under the facts in this case. Neither do we suggest that it would be improper to restrict respondent only as to those customers with whom he came in contact while in the service of appellant. *See Columbia College of Music & School of Dramatic Art v. Tunberg,* 64 Wash. 19, 116 Pac. 280 (1911), in which such a restriction was found adequate to protect the employer. We do not limit the court upon new trial to any given formula for determining reasonable restrictions, nor do we read any of the cases cited in this opinion as so limiting a trial court. While guidelines set down in similar cases are helpful, the facts of a given case must determine the reasonableness of the restrictions imposed.

## IV.

It is well settled that a court of equity will use its power to enforce a restriction against a former employee's competition only to the extent that such restriction is reasonable and necessary to protect a legitimate business interest of the employer. *Racine v. Bender, supra, Schneller v. Hayes,* 176 Wash. 115, 28 P.2d 273 (1934). *See also* 6A Corbin, Contracts § 1394 (1962). But it does not follow that an entire contract must fail because of an unreasonable restriction as to time and area. One line of authority holds that unless the contract is divisible the court will not write a new contract and will refuse to grant any equitable relief against competition. *See, e.g., Wisconsin Ice & Coal Co. v. Lueth,* 213 Wis. 42, 250 N.W. 819 (1933); *Welcome Wagon, Inc. v. Morris,* 224 F.2d 693 (4th Cir. 1955); Restatement, Contracts § 518 (1932). However, a substantial number of American courts in later cases have adopted a new and different rule that a contract in restraint of trade will be enforced to the extent it is reasonable and lawful. *See, e.g., John Roane, Inc. v. Tweed,* 33 Del. Ch. 4, 89 A.2d 548, 41 A.L.R.2d 1 (1952); *Redd Pest Control Co. v. Heatherly,* 248 Miss. 34, 157 So. 2d 133 (1963); *Igoe v. Atlas Ready-Mix, Inc.,* 134 N.W.2d 511 (N.D. 1965).

■ We adopt the reasoning in the second line of cases. The enforcement of such a contract does not depend upon mechanical divisibility, meaning that offending portions of the covenant can be lined out and still leave the remainder grammatically meaningful and thus enforceable. This is the so-called "blue pencil test." The better test is whether partial enforcement is possible without injury to the public and without injustice to the parties. *Ceresia v. Mitchell*, 242 S.W.2d 359 (Ky. 1951); *Fullerton Lumber Co. v. Torborg*, 270 Wis. 133, 70 N.W.2d 585 (1955); 17 C.J.S. *Contracts* § 289, at 1224.

Professor Corbin, in approving the latter test, says:

An agreement restricting competition may be perfectly reasonable as to a part of the territory included within the restriction but unreasonable as to the rest. Will the courts enforce such an agreement in part while holding the remainder invalid? It renders no service to say that the answer depends upon whether or not the contract is "divisible." "Divisibility" is a term that has no general and invariable definition; instead the term varies so much with the subject-matter involved and the purposes in view that its use either as an aid to decision or in the statement of results tends to befog the real issue.

With respect to partial illegality, the real issue is whether partial enforcement is possible without injury to the public and without injustice to the parties themselves. It is believed that such enforcement is quite possible in the great majority of cases. If a seller whose business and good will do not extend beyond the city limits of Trenton promises not to open a competing business anywhere within the state of New Jersey, the restriction is much greater than is reasonable. This is a good reason for refusing to enjoin the seller from doing business in Newark; but it is not a good reason for permitting him to open up a competing store within the same block in Trenton. 6A Corbin, Contracts § 1390, at 66 (1962).

And, at 104:

As in the case of contracts restraining the seller of a business with its good will, the fact that the restriction on an employee goes too far to be valid as a whole does not prevent a court from enforcing it in part insofar as it is reasonable and not oppressive. The injunction may be

made operative only as to reasonable space and time; . . . . 6A Corbin, Contracts § 1394 (1962).

Professor Williston's comments on the subject are as follows:

> If a sharply defined line separated a restraint which is excessive territorially from such restraint as is permissible, there seems no reason why effect should not be given to a restrictive promise indivisible in terms, to the extent that it is lawful. If it be said that the attempt to impose an excessive restraint invalidates the whole promise, a similar attempt should invalidate a whole contract, though the promises are in terms divisible. Questions involving legality of contracts should not depend on form. Public policy surely is not concerned to distinguish differences of wording in agreements of identical meaning. 5 Williston, Contracts § 1660 (rev. ed. 1937).

We are in accord with the views expressed by Corbin and Williston. Under the circumstances of this case we find it just and equitable to protect appellant by injunction to the extent necessary to accomplish the basic purpose of the contract insofar as such contract is reasonable. The trial court erred in granting dismissal at the close of appellant's case. A new trial must be afforded to determine what is reasonable regarding time and space in limiting respondent's competitive horseshoeing activities, wherein both parties may offer evidence bearing thereon. Since we do not have the benefit of respondent's evidence, we cannot decide whether the restriction should be as to area, *i.e.*, a certain number of miles from appellant's business, or as to those customers which respondent came to know during his employment with appellant. Neither can we decide a precise limitation as to time.

The judgment should be reversed and remanded for new trial consistent with the views expressed herein. It is so ordered.

HILL, WEAVER, HUNTER, HAMILTON, and NEILL, JJ., concur.

ROSELLINI, J. (dissenting)—The respondent was born and raised in the small community of Cleveland, Tennessee.

When he was 17 years old, he entered the United States Army and had not completed his high school studies. While in the army, he was awarded an army high school diploma.

The respondent, prior to army service, had no special training for employment and had not held any compensable employment.

After his discharge from the army, the respondent married and lived with his wife at Eatonville, Pierce County, Washington. He was 25 years old at the time of trial.

Prior to beginning his apprenticeship as a horseshoer, he served 4 months as a deputy sheriff for Pierce County. In November 1961, the respondent began apprenticeship with the appellant and was paid $1 for each horse shod. Nothing was said in regard to an agreement not to compete. In the latter part of 1961, the appellant asked the respondent to go to his accountant's office, stating that he had a contract which he desired the respondent to sign. The respondent signed the contract described by the majority.

Evidence discloses that horseshoeing can be taught in college in a 5-weeks' course. The apprenticeship under the appellant lasted from November 1961 to the middle of July 1962, approximately an 8-months' period. From July 1962, the respondent was considered a journeyman horseshoer. He was permitted to and did shoe horses without direction or advice from appellant.

The record shows that there are approximately 3,000 horses in Pierce County. The appellant had approximately 130 customers. There is no contention that these customers owned all or even a substantial percentage of these horses.

When the respondent terminated his employment with the appellant, he began shoeing horses. Eleven months after his departure, he had only 13 rotating customers who had been customers of the appellant. A rotating customer is defined as one who, by agreement, has his horse shod for a period of a year; during that period his horse will be shod every 6 to 8 weeks without the necessity of the owner asking for the service.

The majority, in reversing the trial court, fails to note that courts are reluctant to enforce contracts which pro-

hibit individuals from continuing to work. It holds that the contract is enforceable even though the restriction of engaging in the business of horseshoeing for a period of 5 years and within 100 miles' vicinity of Pierce County is unreasonable. The majority has failed to observe that there is a different test applied where restrictions are contained in bargains for transfer of land or business and to where they are contained in bargains for employment. A restriction which may be upheld as reasonable in the sale of land or a business, may be found unduly harsh where the relationship between the parties has been that of employer and employee. This is rightly so because by an improvident contract entered into by an employee may deny him the opportunity to earn a livelihood which is every man's right.

Restatement of Contracts, § 515 (1932), and the comments beginning at 988, illustrates this rule:

A restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification, if it

(a) is greater than is required for the protection of the person for whose benefit the restraint is imposed, or

(b) imposes undue hardship upon the person restricted, or

(c) tends to create, or has for its purpose to create, a monopoly, or to control prices or to limit production artificially, or

(d) unreasonably restricts the alienation or use of anything that is a subject of property, or

(e) is based on a promise to refrain from competition and is not ancillary either to a contract for the transfer of good-will or other subject of property or to an existing employment or contract of employment.

. . . .

b. No identical test of reasonableness applies to bargains for the transfer of land or goods or of a business, on the one hand, and to bargains for employment on the other. The elements that must be considered in order to determine reasonableness differ in the two cases, especially where the employment is of a specialized character, and familiarity and skill in it are assets of the em-

ployee. Limitations of his use of these assets are less readily supported than limitations of the use of property or in carrying on a business.

. . . .

*Illustrations of Clause* (b):

5. A, a lawyer, employs B, a young lawyer, as his clerk, who as part of the bargain covenants not to engage in the practice of law within the State after the termination of the employment. Although A's practice extends throughout the State, the covenant is illegal, since it imposes undue hardship upon B.

6. A employes B for five years as manager of a clothing store. B covenants as part of the bargain not to engage or to be employed in similar business in any city where A has a store. A has stores in five of the principal cities in the State. The covenant is illegal, as imposing an undue hardship on B.

7. A and B enter into a contract of employment in which B promises not to engage in a similar business anywhere within the State after the termination of the employment. A's business does not extend throughout the State but he hopes that it may later do so. B's promise to refrain from entering into a similar occupation is illegal.

Also, when the restraint is excessive as to time, the court will not enforce the restriction. Thus in *Schneller v. Hayes,* 176 Wash. 115, 28 P.2d 273 (1934), the court refused to enforce the restriction because it was unlimited as to time.

In *Welcome Wagon, Inc. v. Morris,* 224 F.2d 693 (4th Cir. 1955), a case in which it was sought to enjoin Morris from violating a covenant (contained in her contract of employment with Welcome Wagon), not to engage in the same business or a business similar to that of Welcome Wagon, the district judge denied injunctive relief, and the decision was affirmed upon appeal. The contract in that case provided:

'. . . [T]hat she will not during the term of this employment, and for a period of five whole years thereunder, engage directly or indirectly, for herself or as a representative or employee of others, in the same kind or similar business as that engaged in by the said Thomas W. Briggs, under the trade name of the Welcome Wagon

Service Company and its subsidiaries, (1) in Gastonia, N. C., and or (2) in any other city, town, borough, township, village, province or other place in the United States or Canada in which said Thomas W. Briggs, under any of said trade names, is then engaged in rendering his said services, and/or (3) in any city, town, borough, township, village, province or other place in the United States or Canada in which said Thomas W. Briggs, under any of said trade names, has been or has signified his intention to be engaged in rendering his said services.'

The opinion states at 698:

One of the most elaborate opinions in this field is that of Judge Hoover (Court of Common Pleas of Ohio, Cuyahoga County, 1952), Arthur Murray Dance Studios of Cleveland v. Witter, 105 N.E.2d 685, 687, covering twenty-seven printed pages. As Judge Hoover said in that opinion: "This is not one of those questions on which the legal researcher cannot find enough to quench his thirst. To the contrary there is so much authority it drowns him." He then cites voluminous authorities under seven seas: the periodical sea, the sea of annotations, the sea of encyclopedias, the sea of treatises, the restatement sea, the digest sea and Ohio's own sea.

Such contracts were regarded with high disfavor under the old common law. And they are so regarded, in general, by modern courts, though apparently with some amelioration of the ancient disfavor. Modern courts have usually, in passing on these contracts, employed three criteria: (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest? (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood? (3) Is the restraint reasonable from the standpoint of a sound public policy.

And, at 701:

Even if the restrictive covenant be not void, so that a suit at law for damages arising out of a breach of the covenant might lie, we think this covenant here might fairly be characterized as harsh and oppressive. And equity is slow to enforce such contracts through its extraordinary remedies such as specific performance and injunction, remedies that normally rest in the sound discretion

of the trial judge. Nor do we think that Welcome Wagon here has suffered anything even approaching irreparable damage.

In the leading case of *Herbert Morris, Ltd. v. Saxelby,* [1916] A.C. 688, 702, Lord Atkinson said that an employer

[I]s undoubtedly entitled to have his interest in his trade secrets protected, such as secret processes of manufacture which may be of vast value. . . . He is also entitled not to have his old customers by solicitation or such other means enticed away from him. But freedom from all competition per se apart from both these things, however lucrative it might be to him, he is not entitled to be protected against. He must be prepared to encounter that even at the hands of a former employee.

Lord Parker pointed out that there is a distinction between restrictions placed upon a vendor and equal restrictions placed upon an employee. He said, at 709:

It is quite different in the case of an employer taking such a covenant from his employee or apprentice. The good will of his business is, under the conditions in which we live, necessarily subject to the competition of all persons (including the servant or apprentice) who choose to engage in a similar trade. The employer in such a case is not endeavouring to protect what he has, but to gain a special advantage which he could not otherwise secure. I cannot find any case in which a covenant against competition by a servant or apprentice has, as such, ever been upheld by the Court. Wherever such covenants have been upheld it has been on the ground, not that the servant or apprentice would, by reason of his employment or training, obtain the skill and knowledge necessary to equip him as a possible competitor in the trade, but that he might obtain such personal knowledge of an influence over the customers of his employer, or such an acquaintance with his employer's trade secrets as would enable him, if competition were allowed, to take advantage of his employer's trade connection or utilize information confidentially obtained.

In *Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Co.,* [1894] A.C. 535, 566, Lord Macnaghten said: "[T]here is obviously more freedom of contract between buyer and seller than between master and servant or between an em-

ployer and a person seeking employment." This was quoted in *Mason v. Provident Clothing & Supply Co.,* [1913] A.C. 724, 738, and the idea repeated:

> [T]here is much greater room for allowing, as between buyer and seller, a larger scope for freedom of contract and a correspondingly large restraint in freedom of trade, than there is for allowing a restraint of the opportunity for labour in a contract between master and servant or an employer and an applicant for work.

*See also Styles v. Lyon,* 87 Conn. 23, 86 Atl. 564 (1913); *Allen Mfg. Co. v. Murphy,* 23 Ont. L.R. 467 (1911).

In *Standard Oil Co. v. Bertelsen,* 186 Minn. 483, 487, 243 N.W. 701 (1932), the court said:

> The defendant resided with his children in the community of Buffalo Lake. He had lived there for some 17 years, was known and had his friends and relatives there. To require him either to change his occupation, which he had followed for some three years, or to remove to a different community, was a harsh burden on him. A man's right to labor in any occupation in which he is fit to engage is a valuable right, which should not be taken from him or limited by injunction except in a clear case showing the justice and necessity therefor.

The restriction of 5 years and 100 miles' vicinity are unreasonable as to time and area. The court should be slow to enforce an agreement restraining an employee from engaging in his occupation. In the instant case the respondent does not know and has never worked at any other occupation than horseshoeing. If an injunction is granted it will be necessary for respondent to sell his home and move elsewhere. The great hardship to the respondent seems oppressive and harsh when it is compared to benefits the contract bestows upon the appellant. There is no showing of irreparable harm to the appellant if the contract is not enforced. The damage he may sustain is minute in comparison to the respondent's damage. From the record it appears that the restraint is not reasonable and necessary for the protection of the appellant. This is so because there are 3,000 horses in the vicinity and the appellant has only 130 customers. Thus he has ample opportunity and potential to increase his busi-

ness, while the respondent is prevented from earning his livelihood in the only manner for which he is trained.

The cross-examination of the appellant suggests that the reason some of his customers left him was because he was inattentive to his business and some of his work was not satisfactory to them. The public interest is a factor to be considered. The public has a right to obtain the best services possible and should not be forced by the court to accept services which may be inferior.

When the equity power of the court is invoked, it is the duty of the court to weigh the consideration of the contract. It must find that the bargain is fair and equitable between the parties. If it is unfair or the consideration of the party seeking injunctive relief is small in comparison to the penalty he seeks to impose on the other party, the court should refrain from using its injunctive powers.

Since horseshoeing can be taught in 5 weeks in college, and an apprentice can become a journeyman horseshoer in 8 months, it is not an occupation that is special, unique, or extraordinary. Thus a restriction such as that imposed on the respondent is not a reasonable quid pro quo for being taught the occupation of horseshoeing.

I believe this contract should not be enforced. I would affirm the trial court. In any event if it is enforced, it should be governed by the rule in *Columbia College of Music & School of Dramatic Art v. Tunberg*, 64 Wash. 19, 116 Pac. 280 (1911), where the court refused to enforce a contract by a music teacher not to teach elsewhere except to restrain him from soliciting clients of his employer. Any other result would be unjust and would prevent the respondent from earning a livelihood by the only occupation for which he is trained.

HALE, J., concurs with ROSELLINI, J.