SOLARI INDUSTRIES, INC. AND SOLARI AMERICA, INC., PLAINTIFFS-APPELLANTS, v. JOSEPH J. MALADY, INDIVIDUALLY, AND DOING BUSINESS AS AIRPORT PRODUCTS COMPANY, DEFENDANT-RESPONDENT.

Argued February 2, 1970—Decided April 20, 1970.

*Mr. Peyton H. Moss* of the New York bar argued the cause for appellants (*Mr. Ralph Neibart,* attorney).

*Mr. Francis P. Witham* argued the cause for respondent (*Messrs. Markey and Witham,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Chancery Division held that the noncompetitive provision in the defendant's employment contract was void per se and therefore denied the plaintiffs' application for an interlocutory injunction against its breach. The Appellate Division denied leave to appeal but we granted such leave and have heard full argument on the issues submitted by the parties.

An Italian corporation called Solari & C./Udine s.p.a. manufactures informational boards which are known as teleindicators and are seen generally at airport and railroad terminals. Solari's representative in the United States was originally the Signaltron Corporation. On or about January 1, 1966 the plaintiff Solari America, Inc., a New York corporation, replaced Signaltron and shortly thereafter the defendant Malady entered into a contract with Solari America. The contract provided that Malady would devote his entire time to the business of Solari America and would receive a salary of $10,000 per annum plus commission based primarily on the sales of teleindicators to purchasers in the United States. Earlier, Malady had been active in the same field and he brought several prospective customers with him when he joined Solari America. He assigned these prospective customers to Solari America and received an additional payment of $1500 therefor. While associated with Solari America, Malady was its President, its Chief Executive Officer and a member of its Board of Directors.

In January 1969, Solari Industries, Inc., a New Jersey corporation, was created as part of the reorganization of Solari's corporate structure in the United States. In March 1969, Malady entered into a new contract with Solari Industries effective as of January 1, 1969. It provided that it "shall be governed in all respects by the laws of the State of New York" and it fixed Malady's salary at $24,500 per annum plus a 1% commission on teleindicator sales in excess of $250,000 to purchasers in the United States. It contained,

as did his prior contract with Solari America, a noncompetitive agreement reading as follows:

"Malady agrees that on the termination of his employment, for any reason whatsoever, he will not for one year thereafter engage, either directly or indirectly, without the prior consent in writing of the Board of Directors of Solari Industries, in promoting or selling equipment, products, appliances or systems similar to or competitive with any of those represented by Solari Industries or Solari America nor will he within said year divert or attempt to divert from Solari Industries or Solari America or any business represented by it any business whatsoever, particularly by influencing or attempting to influence any of the customers with whom he may have had dealings in connection with the promotion of equipment, products, appliances or systems hereunder."

The new contract set forth, as did the old, that Malady would devote his entire time to Solari's business and would perform such services as the Board of Directors required. However, it contained a provision that Malady would report to the resident Vice President of Solari Industries who was a man named Civale and with whom Malady later developed serious differences. In April 1969, Malady wrote to the General Manager of the parent company in Italy, voicing his complaints about the manner in which he was being treated. He stated that, although he had been assured prior to the reorganization of Solari's corporate structure that his authority would not be reduced, actions taken under Civale's orders had left him with titles and little authority. He expressed the thought that he was being deliberately forced out and later, under date of April 25, 1969, he signed a letter agreement which actually terminated his employment. Under this agreement Solari paid Malady the sum of $10,015.40 representing his salary through September 30, 1969 plus commission on sales through December 31, 1968. Solari expressly acknowledged the continued effectiveness of the commission arrangement and agreed to pay commission for teleindicator sales in the calendar year 1969 in excess of $250,000. Malady expressly acknowledged the con-

tinued effectiveness of the noncompetitive employment provision and agreed to abide thereby.

After the termination of his association with Solari, Malady went to Italy and obtained a franchise from Mischiatti for the distribution of its products in the United States and Canada. The Mischiatti products are competitive with Solari's teleindicators although Malady says they differ somewhat and are superior in operation. It is admitted that Malady recently visited customers and prospective customers of Solari although he says that before he did so he obtained a legal opinion from his attorney to the effect that the noncompetitive provision is unreasonable and void because it "failed to define an area." *See Hudson Foam Latex Products, Inc. v. Aiken,* 82 *N. J. Super.* 508, 512–15 (*App. Div.* 1964) ; *Creter v. Creter,* 52 *N. J. Super.* 197, 201 (*App. Div.*), *certif. granted,* 28 *N. J.* 348 (1958), *appeal dismissed by consent of parties,* May 4, 1959 ; *Magic Fingers, Inc. v. Robins,* 86 *N. J. Super.* 236, 239 (*Ch. Div.* 1965) ; but *cf.* Blake, "Employee Agreements Not to Compete," 73 *Harv. L. Rev.* 625, 674–76 (1960) ; 5 *Williston, Contracts,* § 1660 at 4683–85 (*Rev. ed.* 1937) ; 6A *Corbin, Contracts,* § 1394 at 104–05 (1962) ; 13 *Rutgers L. Rev.* 393 (1958) ; 54 *Mich. L. Rev.* 416 (1956).

In their complaint, the plaintiffs sought interlocutory and final relief enjoining the defendant from violating the terms of the noncompetitive provision of his contract. They obtained an order to show cause with ad interim restraint. The answer filed by the defendant admitted most of the essential factual allegations in the complaint but set forth that the provision was unreasonable and void, that the plaintiffs were by their own unfair conduct estopped from enforcing the provision, and that the plaintiffs were guilty of fraud and misrepresentation and did not come into equity with clean hands. *See* 6A *Corbin, supra,* § 1394 at 89–93 ; Blake, *supra,* 73 *Harv. L. Rev.* at 684–86. After argument, the Chancery Division vacated the order to show cause with its interim restraint and denied the plaintiffs' application for

interlocutory relief. It rejected the plaintiffs' contention that since the employment contract was executed in New York and expressly provided that the law of New York was to be controlling, its meaning and validity are governed by New York rather than New Jersey law. *See Award Incentives, Inc. v. Van Rooyen,* 263 *F.* 2d 173, 177 (3 *Cir.* 1959); *Farris Engineering Corp. v. Service Bureau Corp.,* 406 *F.* 2d 519, 520–21 (3 *Cir.* 1969); *Colozzi v. Bevko, Inc.,* 17 *N. J.* 194, 202 (1955); *Naylor v. Conroy,* 46 *N. J. Super.* 387, 391 (*App. Div.* 1957); *cf. Kievit v. Loyal Protect. Life Ins. Co.,* 34 *N. J.* 475, 491–93 (1961). The Chancery Division took the position that, assuming the provision is enforceable in the courts of New York, at least in reasonable part (*see Interstate Tea Co. v. Alt,* 271 *N. Y.* 76, 2 *N. E.* 2d 51 (1936); *Carpenter & Hughes v. De Joseph,* 13 *A. D.* 2d 611, 213 *N. Y. S.* 2d 860, *aff'd* 10 *N. Y.* 2d 925, 224 *N. Y. S.* 2d 9, 179 *N. E.* 2d 854 (1961); *cf. Purchasing Associates, Inc. v Weitz,* 13 *N. Y.* 2d 267, 246 *N. Y. S.* 2d 600, 196 *N. E.* 2d 245 (1963)), New Jersey's public policy is still determinative in this proceeding (*cf. Lobek v. Gross,* 2 *N. J.* 100, 102 (1949)) and that under that policy a noncompetitive provision which, as here, contains no express geographical limitation is unreasonable and void per se and is not in any part enforceable in our courts. In support, it placed primary reliance on the Appellate and Chancery Division holdings in *Hudson Foam, supra,* 82 *N. J. Super.* 508, *Creter, supra,* 52 *N. J. Super.* 197, and *Magic Fingers, supra,* 86 *N. J. Super.* 236.

Much has been written with regard to noncompetitive agreements and the books are filled with judicial decisions embodying varying holdings in varying contexts. They have been collected elsewhere and need not be recited here. *See Arthur Murray Dance Studios of Cleveland, Inc. v. Witter,* 62 *Ohio Law Abst.* 17, 105 *N. E.* 2d 685 (C. P. 1952); Blake, *supra,* 73 *Harv. L. Rev.* 625; *Annotations,* 43 *A. L. R.* 2d 94 (1955), 46 *A. L. R.* 2d 119 (1956), 70 *A. L. R.* 2d 1292 (1960); *see also* 5 *Williston, supra,* § 1628 *et seq.;* 6A *Corbin, supra,* § 1379 *et seq.; Kreider,* "Trends in the

Enforcement of Restrictive Employment Contracts," 35 *U. Cin. L. Rev.* 16 (1966) ; Marcoux, "Covenants Not to Compete in Common Law," 10 *C. de D.* 251 (1969) ; Comment, "Contracts in Restraint of Trade : Employee Covenants Not to Compete," 21 *Ark. L. Rev.* 214 (1967) ; Comment, "Covenants Not to Compete: The Tennessee Cases," 31 *Tenn. L. Rev.* 450 (1964) ; 13 *Rutgers L. Rev.* 393, *supra.;* 54 *Mich. L. Rev.* 416, *supra.* Though noncompetitive agreements were at one time flatly outlawed, it is now well recognized that they do have a proper place and are enforceable under appropriate circumstances. Thus a seller's incidental noncompetitive covenant, which is designed to protect the good will of the business for the buyer, is freely enforceable in the courts. And while a covenant by an employee not to compete after the termination of his employment is not, because of the countervailing policy considerations, as freely enforceable, it will nonetheless be given effect if it is reasonable in view of all the circumstances of the particular case. It will generally be found to be reasonable where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public. *See* Blake, *supra,* 73 *Harv. L. Rev.* at 648 *et seq.; Comment, supra,* 31 *Tenn. L. Rev.* at 452–55; *Comment, supra,* 21 *Ark. L. Rev.* at 215–18.

When an employer, through superior bargaining power, extracts a deliberately unreasonable and oppressive noncompetitive covenant he is in no just position to seek, and should not receive, equitable relief from the courts. 5 *Williston, supra,* § 1659 at 4681–82, § 1660 at 4685. However, an employer may act in full good faith and nonetheless may still find that the terms of the noncompetitive agreement are later judicially viewed as unnecessarily broad. Here courts have often differed as to whether the agreement should (1) be considered wholly void or (2) be afforded judicial sanction to the extent reasonable under the circumstances. Williston and Corbin have given their strong

support to the latter alternative. 5 *Williston, supra,* §§ 1659, 1660; 6A *Corbin, supra,* §§ 1390, 1394.

Williston saw "no reason why effect should not be given to a restrictive promise indivisible in terms, to the extent that it is lawful." 5 *Williston, supra,* § 1660 at 4683. Similarly, Corbin noted that "the fact that the restriction on an employee goes too far to be valid as a whole does not prevent a court from enforcing it in part insofar as it is reasonable and not oppressive"; as he put it, the injunction might be made operative only as to "reasonable space and time" or it might preclude merely "the disclosure of secrets or the solicitation of old customers without requiring the employee to refrain wholly from renewing employment in the same vicinity." 6A *Corbin, supra,* § 1394 at 104–06. A steadily increasing number of courts have recently embraced the persuasive views of Williston and Corbin and have issued lesser restraints against particularized competitive activities where the circumstances disclosed that such was the fair and reasonable course. *See Fullerton Lumber Co. v. Torborg,* 270 *Wis.* 133, 70 *N. W. 2d* 585 (1955); *Ebbeskotte v. Tyler,* 127 *Ind. App.* 433, 142 *N. E.* 2d 905 (1957); *Redd Pest Control Co. v. Heatherly,* 248 *Miss.* 34, 157 *So.* 2d 133 (1963); *Credit Bureau Management Co. v. Huie,* 254 *F. Supp.* 547 (*D. Ark.* 1966); *Wood v. May,* 73 *Wash. 2d* 307, 438 *P. 2d* 587 (1968); Blake, *supra,* 73 *Harv. L. Rev.* at 674, 682; 17 *C. J. S., Contracts,* § 289 at 1224 (1963); *cf. Cedric G. Chase Photo. Lab v. Hennessey,* 327 *Mass.* 137, 97 *N. E.* 2d 397 (1951); *John Roane, Inc. v. Tweed,* 33 *Del. Ch.* 4, 89 *A.* 2d 548 (1952); *Plunkett Chemical Co. v. Reeve,* 373 *Pa.* 513, 95 *A. 2d* 925 (1953); *Denny v. Roth,* 296 *S. W. 2d* 944 (*Tex. Ct. Civ. App.* 1956); *Ramey v. Combined American Ins. Co.,* 359 *S. W. 2d* 523 (*Tex. Ct. Civ. App.* 1962); *but cf. Baker v. Starkey,* 259 *Iowa* 480, 144 *N. W. 2d* 889 (1966); *Extine v. Williamson Midwest, Inc.,* 176 *Ohio St.* 403, 200 *N. E. 2d* 297 (1964).

In *Fullerton Lumber Co. v. Torborg, supra,* the defendant had been employed as manager of the plaintiff's lum-

beryard in Clintonville, Wisconsin. He had agreed that upon the termination of his employment and for a period of ten years thereafter he would not work for any lumber establishment within fifteen miles. However, when he actually ended his employment he set up a competitive lumberyard in Clintonville and thereupon the plaintiff sought injunctive relief. The trial court found that the time fixed in the noncompetitive agreement was unreasonably long and dismissed the plaintiff's complaint. This was reversed by the Wisconsin Supreme Court which noted that although the fixed period was excessive the plaintiff was under the circumstances equitably entitled to a restraint for a reasonable period. The matter was remanded to the trial court with the suggestion that a three-year restraint would clearly be supported by the evidence and with the further suggestion that a restraint confined to Clintonville itself might well be sufficient to protect the plaintiff's legitimate interests. 70 *N. W.* 2d at 592–93.

In the course of his opinion in *Fullerton,* Justice Martin quoted approvingly from the academic writings in the field and from many of the decisions which had followed their lead. He pointed out that the earlier Wisconsin cases had been willing to "blue pencil" portions of unreasonably broad restraints and he saw no reason why "such willingness to enforce a contract after removing terms which are literally divisible should not also exist in the case of indivisible promises where the evidence is ample to support a finding as to the extent the restriction would be necessary and valid." 70 *N. W.* 2d at 592. In response to the occasionally stated fear that a judicial rule calling for enforcement of restraints to the extent that they are reasonable under the circumstances might encourage employers to insist on oppressive restrictions, he noted that in no event are restraints enforceable where their purposes are violative of public policy and that "if there is any credible evidence to susstain a finding that they are deliberately unreasonable and oppressive, such covenants must be held invalid whether

severable or not." 70 *N. W. 2d* at 592; 5 *Williston, supra,* § 1569 at 4681–82, § 1660 at 4685.

In *Wood v. May, supra,* the defendant's noncompetitive agreement was for five years and within one hundred miles. The trial judge dismissed the plaintiff's complaint on his finding that the area was too broad and he refused to narrow the agreement because he considered its terms indivisible. On appeal, the Supreme Court of Washington reversed in an opinion which expressed the thought that both the time and area might well be viewed as excessive but that the trial judge should nonetheless have proceeded to grant such equitable relief as was necessary and reasonable under the circumstances. 438 *P. 2d* at 590. It suggested that perhaps a restraint which merely restricted the defendant from dealing with those customers with whom he actually dealt with while in the plaintiff's employ would be sufficient to protect the employer's legitimate interests and avoid undue hardship on the employee. 438 *P. 2d* at 590. And after citing the two major lines of cases (1) holding that unduly broad restraints will be deemed void in toto and (2) holding that they will be afforded judicial sanction to the extent reasonable under the circumstances, the court said:

> We adopt the reasoning in the second line of cases. The enforcement of such a contract does not depend upon mechanical divisibility, meaning that offending portions of the covenant can be lined out and still leave the remainder grammatically meaningful and thus enforceable. This is the so-called "blue pencil test." The better test is whether partial enforcement is possible without injury to the public and without injustice to the parties. Ceresia v. Mitchell, 242 S. W. 2d 359 (Ky. 1951) ; Fullerton Lumber Co. v. Torborg, 270 Wis. 133, 70 N. W. 2d 585 (1955) ; 17 C. J. S. Contracts § 289 p. 1224.

438 *P. 2d* at 591.

In the case at hand, Malady's activities were centered in New York, his agreement was executed in New York and it was expressly declared subject to the law of New York. We

have little doubt that, under the law of New York, its courts would not wholly invalidate a noncompetitive agreement simply because it was unduly broad on its face but would properly grant such equitable relief as appeared fair and reasonable under all of the circumstances. *See McCall Co. v. Wright,* 198 *N. Y.* 143, 91 *N. E.* 516 (1910); *Interstate Tea Co. v. Alt, supra,* 271 *N. Y.* 76, 2 *N. E. 2d* 51; *Carpenter & Hughes v. De Joseph, supra,* 13 *A. D. 2d* 611, 213 *N. Y. S. 2d* 860, *aff'd.* 10 *N. Y. 2d* 925, 224 *N. Y. S. 2d* 9, 179 *N. E. 2d* 854; *cf. Purchasing Associates, Inc. v. Weitz, supra,* 13 *N. Y. 2d* 267, 246 *N. Y. S. 2d* 600, 196 *N. E. 2d* 245; *see also Foster v. White.* 248 *App. Div.* 451, 290 *N. Y. S.* 394, 398–99 (1936), *aff'd,* 273 *N. Y.* 596, 7 *N. E. 2d* 710 (1937); *Schmidl v. Central Laundry & Supply Co., Inc.,* 13 *N. Y. S. 2d* 817, 824 *(Sup. Ct.* 1939); *Universal Electric Corp. v. Golden Shield Corp.,* 316 *F. 2d* 568, 572 (1 *Cir.* 1963); *Mullaly v. Carlisle Chemical Works, Inc.,* 177 *F. Supp.* 588, 594–97 *(D. N. J.* 1959).

In *McCall* the court upheld the plaintiff's complaint which sought to restrain the defendant, who had acquired knowledge of the plaintiff's business methods and secrets while in its employ, from associating himself with a rival business company in violation of a noncompetitive agreement; the fact that the agreement was unduly broad in its terms was mentioned in the court's opinion with only the passing comment that the plaintiff was not entitled to and did not seek such broad relief. 91 *N. E.* at 517. In *Interstate Tea Co.,* the court declined to enforce the more comprehensive terms of the defendant's noncompetitive agreement but did direct that the defendant be restrained "from establishing any trade relationship in competition with the plaintiff with customers of the plaintiff served by the defendant or whose names were learned by him during his employment by the plaintiff. . . ." 2 *N. E. 2d* at 53. In *Carpenter & Hughes* the defendant agreed that he would not engage in the ophthalmic dispensing business in Syracuse, nor solicit the plaintiffs' customers, nor disclose their identity or reveal information with respect to the plaintiffs' business for five years after the termination

of his employment with the plaintiffs. The court held that although the plaintiffs could not enforce the broad terms of the agreement they were entitled to an injunctive order restraining the defendant "from soliciting the business of plaintiffs' customers and revealing their identity or disclosing other information relating to ophthalmic dispensing of such customers, other than from the medical profession." 213 *N. Y. S. 2d* at 860, 179 *N. E. 2d* at 854. *See also Schmidl v. Central Laundry & Supply Co., Inc., supra,* where the court held that although the covenant not to compete in the employer's business for ten years could not be enforced, a restraint against soliciting the employer's customers for a period of at least nine months could readily be justified as necessary to protect the employer's business and on grounds of "fairness and justice." 13 *N. Y. S. 2d* at 824.

Though the law of New York permits partial enforcement as aforestated we must still turn to our own law to determine whether comparable partial enforcement would violate New Jersey's public policy. *See Lobek v. Gross, supra,* 2 *N. J.* at 102; *HIMC Investment Co. v. Siciliano,* 103 *N. J. Super.* 27, 35 *(Law Div.* 1968); *cf. Oxford Consumer Dis. Co. of No. Phila. v. Stefanelli,* 102 *N. J. Super.* 549, 575 *(App. Div.* 1968), 104 *N. J. Super.* 512 *(App. Div.* 1969), *aff'd,* 55 *N. J.* 489 (1970). Admittedly we have no local policy which would invalidate all employee agreements not to compete. In *Mandeville v. Harman,* 42 *N. J. Eq.* 185 *(Ch.* 1886), Vice Chancellor Van Fleet indicated that a contractual restraint against postemployment competition would be deemed valid so long as it was reasonable and that it would be considered reasonable if it afforded no more than "fair protection" to the employer and did not "interfere with the interest of the public." 42 *N. J. Eq.* at 190. In later cases, our courts have repeatedly stated that covenants against postemployment competition will receive judicial sanction "where the prohibition is reasonably necessary for the protection of the business of the employer, is not unreasonably restrictive in point of time or territory upon the rights of the employee, and is not prej-

udicial to the public interests." *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 2 *N. J.* 235, 248 (1949); *Chas. S. Wood & Co. v. Kane*, 42 *N. J. Super.* 122, 124 (*App. Div.* 1956); *Silbros, Inc. v. Solomon*, 139 *N. J. Eq.* 528, 529 (*Ch.* 1947).

In *Mandeville* an employee's restrictive covenant which had no time limit was deemed unreasonable and void; apparently no one suggested to the Vice Chancellor that the covenant might justly be enforced for a reasonable time and accordingly he did not deal with the subject. 42 *N. J. Eq.* at 191–95. However, in *Althen v. Vreeland*, 36 *A.* 479 (*N. J. Ch.* 1897), the issue was properly raised before Vice Chancellor Emery. The seller of a baking establishment, which did business mainly in the State of New Jersey and the cities of New York and Brooklyn, agreed that he would not engage "in a similar business within 1,000 miles of Newark." The provision was obviously overbroad but the buyer sought a restraint confined to New Jersey. The Vice Chancellor declined to grant the requested relief, suggesting that if the agreement, which he described as indivisible in language, is enforced at all "it must be enforced according to its terms. . . ." 36 *A.* at 481. Just why this would be so is difficult to fathom, for surely since the seller accepted the restraint in the more extensive area he may fairly be dealt with as having also accepted the restraint in any lesser included area which the court might reasonably fix in the exercise of its equitable jurisdiction. Corbin has pointedly expressed himself on the matter, using New Jersey illustratively:

With respect to partial illegality, the real issue is whether partial enforcement is possible without injury to the public and without injustice to the parties themselves. It is believed that such enforcement is quite possible in the great majority of cases. If a seller whose business and good will do not extend beyond the city limits of Trenton promises not to open a competing business anywhere within the state of New Jersey, the restriction is much greater than is reasonable. This is a good reason for refusing to enjoin the seller from doing business in Newark; but it is not a good reason for permitting him to open up a competing store within the same block in Trenton.

6A *Corbin, supra,* § 1390 at 67.

Despite the persistent academic criticism and the increasing number of opposing judicial decisions elsewhere, the New Jersey courts have thus far generally adhered to the notion that an unreasonably broad noncompetitive provision is void per se. The resulting injustices have been alleviated only in part by the so-called divisibility or selective construction rule (*Creter v. Creter, supra,* 52 *N. J. Super.* at 203–04) which unfortunately has placed form above substance and has led to tortuous interpretations and incongruous differentiations. *Compare Trenton Potteries Co. v. Oliphant,* 58 *N. J. Eq.* 507, 516–18 (*E. & A.* 1899), and *Fleckenstein Bros. Co. v. Fleckenstein,* 76 *N. J. L.* 613, 616–18 (*E. & A.* 1908) *with Wyder v. Milhomme,* 96 *N. J. L.* 500, 502–04 (*E. & A.* 1921), *and Automobile Club of Southern N. J. v. Zubrin,* 127 *N. J. Eq.* 202, 204–05 (*Ch.* 1940).

In *Trenton Potteries* the court granted a restraint confined to New Jersey alone though the contract broadly restricted the defendants from engaging in the pottery ware business "within any state in the United States of America or within the District of Columbia, except in the State of Nevada and the Territory of Arizona . . ." (58 *N. J. Eq.* at 513); but in *Wyder* the court refused to grant to the plaintiff, whose business was in the Metropolitan New York area, any restraint whatever where the contract broadly restricted the defendant from engaging in a similar competitive business "in the United States of America." 96 *N. J. L.* at 501. In *Fleckenstein* the court granted a restraint confined to Jersey City alone though the contract embodied a broad restraint against competition "within five hundred miles from the city of Jersey City" (76 *N. J. L.* at 616); but in *Zubrin* the court refused to grant any restraint whatever to the plaintiff, whose business was in some but not all of the south Jersey counties, where the contract broadly restricted the defendant from engaging "in a competitive

business anywhere in Southern New Jersey south of Trenton, New Jersey." 127 *N. J. Eq.* at 203.

As the cited judicial opinions indicate, the rule of divisibility or selective construction has, at the expense of the basic values, exalted formalisms and rewarded artful draftsmanships. In the process individual results have been reached which hardly conform with any sound equitable concepts. In some instances, judges have upheld sweeping noncompetitive agreements in circumstances which suggest that, if their equitable power to do so had been recognized, they would have cut them down to satisfy the particular needs at hand. *See Pilgrim Coat, Apron, &c., Inc. v. Krzywulak,* 141 *N. J. Eq.* 212, 217 (*Ch.* 1948); *cf. Artistic Porcelain Co. v. Boch,* 76 *N. J. Eq.* 533 (*Ch.* 1909); *Voices, Inc. v. Metal Tone Mfg. Co., Inc.,* 119 *N. J. Eq.* 324 (*Ch.*), *aff'd,* 120 *N. J. Eq.* 618 (*E. & A.* 1936). In other instances, they have stricken noncompetitive agreements in their entirety, as too broad, though justice and equity seemed to cry out for the issuance of appropriately limited restraints which would simply protect the legitimate interests of the covenantee in reasonable fashion, would not subject the covenantor to any undue hardship, and would not impair the public interest. *See Creter v. Creter, supra,* 52 *N. J. Super.* 197; *cf. Hudson Foam Latex Products, Inc. v. Aiken, supra,* 82 *N. J. Super.* 508; *Magic Fingers, Inc. v. Robins, supra,* 86 *N. J. Super.* 236.

*Creter v. Creter, supra,* serves well to illustrate the unworthiness of any flat prohibition against the partial enforcement of an unduly broad noncompetitive agreement. Frank and Harry Creter were brothers engaged as partners in a burial vault business in the Newark area. The business expanded somewhat but was mostly conducted in seven Northern New Jersey counties. The partners had agreed that a retiring partner would not carry on the burial vault business "within the State of New Jersey" for a period of five (5) years. Frank wanted to retire and set up a competing burial vault business in the Newark area; he brought

a declaratory judgment proceeding to have the noncompetitive agreement declared wholly illegal and unenforceable "because it encompasses an unreasonably large area." The Appellate Division struck the entire restriction as being unduly broad and therefore void per se; it declined to apply the doctrine of divisibility or selective construction because, as it said, there was nothing in the language of the agreement "whereby any particular county or counties may be considered as separately identified." 52 *N. J. Super.* at 204. In other words, the agreement did not enumerate the twenty-one counties which constitute "the state of New Jersey" to which it referred; if it had, the Appellate Division presumably would have upheld the agreement at least insofar as some or all of the seven northern counties were concerned. Surely our law should no longer be permitted to turn on such formalities (*see* 13 *Rutgers L. Rev.* 393, *supra*).

We are entirely satisfied that the time is well due for the abandonment of New Jersey's void per se rule in favor of the rule which permits the total or partial enforcement of noncompetitive agreements to the extent reasonable under the circumstances. 5 *Williston, supra,* §§ 1659, 1660; 6A *Corbin, supra,* §§ 1390, 1394; *Fullerton Lumber Co. v. Torborg, supra,* 270 *Wis.* 133, 70 *N. W. 2d* 585; *Wood v. May, supra,* 73 *Wash.* 2d 307, 438 *P. 2d* 587. For present purposes and to the extent pertinent here, this brings our law in line with that of our neighboring State of New York and avoids the further need for consideration of any conflict of laws principles in the case at hand. As we see it, under either law these plaintiffs are entitled, subject to any affirmative defenses such as those asserted in the defendant's answer (6A *Corbin, supra,* § 1394 at 89–93; Blake, *supra,* 73 *Harv. L. Rev.* at 684–86), to that limited measure of relief within the terms of the noncompetitive agreement which is reasonably necessary to protect their legitimate interests, will cause no undue hardship on the defendant, and will not impair the public interest.

In the light of the foregoing, the matter will be remanded to the Chancery Division for full exploration of all of the material facts (Blake, *supra,* 73 *Harv. L. Rev.* at 646 *et seq.*) and, since no interim relief is being directed, a very early date for final hearing is to be fixed. Before us there was no suggestion that Malady, who admittedly had a high executive position with substantial salary, was imposed upon in the execution of the noncompetitive agreement or that Solari did not act in full good faith in formulating it. However, there was general acknowledgment on the part of the plaintiffs that their legitimate interests would be adequately protected by a limited restraint against Malady's dealing with any of Solari's actual customers or prospective customers in the United States with whom he had substantial dealings on Solari's behalf while in Solari's employ. In view of this and the materials in the record before us, the Chancery Division, if it ultimately grants a judgment embodying injunctive relief, will presumably so confine it with the prescribed period running from the date of the actual judgment. On the present showing there would appear to be no reason for awarding damages beyond such relief· though if an injunction is denied to the plaintiffs the Chancery Division may still entertain their claim for damages. *Cf. Mantell v. International Plastic Harmonica Corp.,* 141 *N. J. Eq.* 379, 393 (*E. & A.* 1947). The Chancery Division will of course afford to the defendant ample opportunity to establish undue hardship or injury to society or, as he asserted before us, that he was dealt with by the plaintiffs so unworthily and in such inequitable manner as to disqualify them from relief. *See* Blake, *supra,* 73 *Harv. L. Rev.* at 684–86; 6A *Corbin, supra,* § 1394 at 89–93.

Remanded to the Chancery Division for further proceedings· in conformity with this opinion.

*For remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.