DURAPIN, INC.

v.

AMERICAN PRODUCTS, INC.

No. 88–88 Appeal.

Supreme Court of Rhode Island.

June 14, 1989.

Milton S. Slepkow, Slepkow, Slepkow, & Bettencourt, Inc., East Providence, for plaintiff.

Raymond J. McMahon, McMahon & McMahon, Providence, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, American Products, Inc., appeals from a judgment entered in favor

of the plaintiff, Durapin, Inc., in a breach-of-contract action heard before a Superior Court justice. Hereafter we shall refer to the plaintiff as Durapin and to the defendant as American.

Durapin based its suit on a distributorship agreement it had entered into with American, claiming that American had failed to perform its contractual obligations. Specifically, Durapin claimed that it was owed $131,000 by American. In response to Durapin's complaint American set forth a number of defenses as well as a counterclaim alleging that Durapin had breached their contract by violating a provision against competition contained in the agreement.

After hearing all the evidence, the trial justice ruled that the noncompetition provision constituted an unreasonable restraint of trade and invalidated it in its entirety. The trial justice then dismissed American's counterclaim and entered judgment in favor of Durapin in the amount of $131,000.[1] In its appeal American asks that we vacate the Superior Court judgment and enter judgment in its favor on American's counterclaim.

■ American's appeal centers on the enforceability of noncompetition provisions in this jurisdiction. Although at one point contracts in restraint of trade were totally outlawed, *see Solari Industries, Inc. v. Malady*, 55 N.J. 571, 576, 264 A.2d 53, 56 (1970), Rhode Island has recognized that a legitimate purpose can be served by such an agreement. We have also subscribed to the general principle that noncompetition agreements are not necessarily void as a matter of law. *Oakdale Manufacturing Co. v. Garst*, 18 R.I. 484, 489, 28 A. 973, 974–75 (1894). However, since such provisions are not favored, they are subject to judicial scrutiny and will be enforced as written only if the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs. *See Koppers Products Co. v. Readio*, 60 R.I. 207, 216–17, 197 A. 441, 444–45 (1938). When considering the validity of a noncompetition agreement, the crucial issue is reasonableness, and that test is dependent upon the particular circumstances surrounding the agreement. *Max Garelick, Inc. v. Leonardo*, 105 R.I. 142, 147, 250 A.2d 354, 356–57 (1969)(citing *Oakdale*, 18 R.I. at 489, 28 A. at 974).

■ Whether a restrictive covenant is reasonable is ultimately a question of law to be determined by the court. *Chapman & Drake v. Harrington*, 545 A.2d 645, 647 (Me.1988). Before a court reaches this question, however, the party seeking to enforce a noncompetition provision must show that (1) the provision is ancillary to an otherwise valid transaction or relationship, such as an employment contract or a contract for the purchase and sale of a business, Restatement (Second) *Contracts* § 187 (1981), (2) the provision is supported by adequate consideration, *Wood v. May*, 73 Wash.2d 307, 310–11, 438 P.2d 587, 589–90 (1968); *see also Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 33 (Tenn.1984), and (3) there exists a legitimate interest that the provision is designed to protect. *Max Garelick, Inc.*, 105 R.I. at 149, 250 A.2d at 357.

Because the validity of a noncompetition provision depends upon the particular facts surrounding the agreement, we must set forth the pertinent facts of this dispute in some detail. Both American and Durapin were involved in some facet of the bowling industry for a number of years prior to their entering into a distributorship agreement in 1972. American was formed in 1951 as a Rhode Island corporation located in Pawtucket, Rhode Island. Its original purpose was to serve as a distributor of bowling pins. Shortly after its formation, however, American purchased a manufacturing plant in Maine and also began to manufacture bowling pins. Durapin, on the other hand, which is a Maine corporation with a place of business in Pawtucket, Rhode Island, began operation in 1964 and has been involved, for the most part, with

---

1. American, by way of a stipulation filed in the Superior Court, conceded that had Durapin not breached the noncompetition provision, Durapin would be entitled to $131,000 under the terms of their contract.

the manufacturing aspect of the business, relying on independent contractors like American to distribute its bowling pins.

The two companies manufactured pins solely for the candlepin and duckpin bowling games, which attract a much smaller commercial market than the more popular tenpin bowling.[2] According to a witness, the market for candlepins is to be found in an area bounded by the Canadian provinces on the north and on the south by the State of Massachusetts whereas the duckpin market extends from nearby Seekonk, Massachusetts, southerly to Virginia and Maryland. American's entry into the candlepin business had been quite successful until a competitor developed and introduced into the marketplace a plastic candlepin that was far superior to American's wooden pin. This new plastic wonder dominated the candlepin business, and American's wooden product became obsolete.

This turn of events caused American and Durapin to join forces. American learned that Durapin was manufacturing a plastic candlepin and looking for a distributor, and financing. Apparently American felt that Durapin's plastic pin could compete with the plastic candlepin then dominating the market, and after some negotiation · it agreed to serve as Durapin's "distributor." Unfortunately, Durapin's product was not able to compete with the competitor's, and this venture proved unsuccessful. However, American's and Durapin's association in the bowling business did not end at this point.

Durapin then directed its efforts and interests toward the duckpin market and began to develop a plastic duckpin that American agreed to distribute. A plastic duckpin was successfully developed, and Durapin was granted a patent on its design and construction. In February 1972 the two companies signed the distributorship agreement now in dispute. Pursuant to this agreement, American was given the exclusive right to purchase and lease all duckpins manufactured by Durapin, without territorial limits, for the duration of the contract. In return for Durapin's promise to manufacture and sell solely to American all its duckpin production, American agreed to employ its best efforts to lease only Durapin duckpins. American would purchase the pins outright at Durapin's manufacturing cost, lease them to duckpin alleys, and share the net rental proceeds with Durapin.

Although this agreement was called a "distributorship" agreement, the facts indicate that the substance of the agreement was more in the nature of a financing agreement than a simple distributorship agreement. From the very beginning Durapin needed financing and American was able to satisfy that need. The gist of their agreement was that American would loan Durapin money that would be used by Durapin to manufacture its pins in return for American's exclusive right to purchase and lease those pins. This financing aspect of their relationship was American's real contribution to the venture. According to the testimony of Albert Bertozzi (Bertozzi), formerly an executive at American, the Durapin duckpin sold itself. It seems that in the bowling-pin market, "[i]f you have an exceptionally good pin, then you have the business." Bertozzi testified that so long as there is no great disparity in price, the better pin will dominate the market. Apparently this is precisely what happened with the duckpin manufactured by Durapin. According to Bertozzi, the joint endeavor between American and Durapin ended up with 80 percent of the duckpin market because Durapin's duckpin "scored"[3] better than any other pin on the market.

---

**2.** It might be worthwhile to point out the differences among the three bowling games. The games differ in the size and shape of the pins used as well as the size and number of balls used. The shape of a duckpin is similar to that of a tenpin, only somewhat shorter and wider, whereas candlepins have a tall, thin, candle shape. In addition, the bowling ball used in tenpin bowling is much larger than the balls used in candlepin and duckpin bowling. Moreover, in the duckpin and candlepin games a player gets three attempts to knock over all the pins whereas the tenpin bowler is restricted to two tries.

**3.** "Scored" is a trade term describing the quality of a pin. The better the bowler's score, the better the pin.

It was agreed that the contract's duration would be five years and that it would be automatically renewed on the same terms for an additional five years unless either party exercised its right to terminate. Pleased that this joint venture in the duckpin market was so successful, neither party exercised its right to terminate, and the original contract was renewed for the additional five-year term.

Like most good things, however, this joint venture came to an end. But in one important aspect their relationship survived—the splitting of the spoils. Because American leased, rather than sold, the duckpins to its customers, the litigants expected that there would be a number of outstanding leases in the event that the agreement was terminated. The pins were typically leased for three-year terms, so it was conceivable that should the contract be terminated for any reason, there could be leases extending anywhere from one month to three years beyond the agreement's termination. These leases would, of course, generate rental proceeds that would have to be divided between Durapin and American. The agreement anticipated and addressed this situation by including a provision giving Durapin the right to share in all net profits from outstanding leases even after the contract's termination. As expected there were several outstanding leases when the contract was terminated, and it is under this profit-sharing provision that Durapin alleged it was entitled to $131,000.

To protect American's interests during this continued profit-sharing arrangement, the contract also included a provision that brings us to the center of this controversy. That provision reads:

"Durapin agrees that it will not solicit, sell or lease plastic duckpins to any customer of American which, at the time of termination of this Agreement, is leasing such pins from American. Said *covenant* will remain in effect so long as

Durapin participates in the profit distribution herein set forth." (Emphasis added.)

It is this provision that American claims Durapin has breached.[4]

Durapin does not deny that it violated this provision shortly after its relationship with American broke down while the parties were negotiating in the summer of 1981 for the terms of a new contract. The renewal term of the original distributorship agreement was scheduled to end in February of 1982, and by August of 1981 American had made it clear that it no longer wished to serve as Durapin's distributor. According to Bertozzi, who conducted negotiations on American's behalf, American believed that Durapin's new proffered contract presented an "unworkable situation." There was also serious concern on American's part about Durapin's future ability to produce a duckpin of satisfactory quality. Bertozzi testified that because of these problems, as well as the fact that he was unable to get along with Durapin's negotiating officer, he believed it was better to sever connections at that point rather than at some other time in the future. Consequently Bertozzi indicated to Durapin that their association in the bowling business would end with the termination of their agreement in 1982.

This revelation occurred about six months prior to the contract's scheduled termination. It was at this point that both American and Durapin began developing individual plans for what would take place after February 1982. Bertozzi began to develop a competitive plastic duckpin that American could market in competition with Durapin's duckpin. Durapin, on the other hand, began to search for another "distributor" to take over American's role. American produced a plastic duckpin that was described by Bertozzi as "better than the Durapin pin." For its part Durapin successfully located a company that was pre-

---

**4.** American argued that Durapin forfeited its right to share in the profits from any of the outstanding leases when it breached the noncompetition provision. Both parties stipulated that American has paid Durapin about $84,000 since the alleged breach occurred. American argues that the $84,000 constitutes an overpayment of revenues from the outstanding leases and, further, that Durapin should be denied the $131,000 to which it would have been entitled had it not breached the noncompetition provision.

pared to begin the distribution of Durapin's duckpin once the contract with American expired. That company was Fair Lanes, Inc. (Fair Lanes), and American claims that it was the solicitation of Fair Lanes's services that constituted a breach of the noncompetition provision because, as of February 1982, Fair Lanes was on American's customer list. The record indicates that no outstanding leases between American and Fair Lanes were affected by Durapin's actions and no pins were sold or leased by Durapin to Fair Lanes until after Durapin's contract with American had expired. Nevertheless, American maintains that it is entitled to a favorable judgment on its counterclaim because Durapin either sold or leased pins to Fair Lanes during the continued profit-sharing phase of the American–Durapin relationship.

The crucial issue in this controversy is the enforceability of the noncompetition provision. American argues that the trial justice should not have invalidated the restriction in its entirety and that judgment should have been entered in its favor on its counterclaim. This contention has two facets.

■ First, American argues that the trial justice erred in finding that the noncompetition provision was a "covenant" rather than a "condition." It argues that the provision really constitutes a forfeiture condition representing liquidated damages and that, unlike a covenant not to compete, it should be enforced regardless of its scope, duration, or overall reasonableness. In its brief, American cites a series of cases it claims supports this position.

Although there is some authority that would support a distinction between a for-

feiture condition restraining competition and a covenant not to compete, giving a more liberal enforcement to the former, *see Sarnoff v. American Home Products Corp.,* 798 F.2d 1075 (7th Cir.1986); *see also Cinelli v. American Home Products Corp.,* 785 F.2d 264, 266 (10th Cir.1986), we need not decide whether a so-called forfeiture condition should receive our stamp of approval.[5] The restraint on competition involved in this dispute is, without doubt, a covenant rather than a condition. Whether language used in a contract creates a condition or a covenant is dependent on the intent of the parties, which must be determined from a fair and reasonable interpretation of the language used in light of the facts and circumstances. *See Jones Associates, Inc. v. Eastside Properties, Inc.,* 41 Wash.App. 462, 466–67, 704 P.2d 681, 684 (1985)(citing 5 *Williston on Contracts,* § 663 at 127 (Jaeger 3d. ed.1961). With regard to that intent, however, it is a fundamental principle of contract law, as well as being well settled in this state, that clear and unambiguous language set out in a contract is controlling and will govern the legal consequences of its provisions. *Elias v. Youngken,* 493 A.2d 158, 163 (R.I.1985). Here the language could not be clearer. The contract's explicit and unambiguous language indicates that the noncompetition provision was intended to operate as a covenant. Furthermore, unlike a right subject to a condition precedent or subsequent, Durapin's right to share in the future profits it now seeks is unqualified. The exact language reads as follows:

"American agrees that if this Agreement is terminated *for whatever cause,* Durapin shall thereafter be entitled to share in the net profits of any pins originally

---

5. The rationale for viewing a forfeiture condition with a kind eye is that, unlike enforcing a covenant by way of an injunction, enforcing a forfeiture condition merely requires a former employee to forfeit a monetary benefit upon entering competition with his or her former employer. *See Sarnoff v. American Home Products Corp.,* 798 F.2d 1075, 1083 (7th Cir.1986). This distinction becomes much more subtle, however, when the forfeiture becomes significantly large. The inducement to avoid the forfeiture condition may become just as strong as the threat of a contempt judgment for the viola-

tion of an injunction order. *Id.* Although we have expressly declined to rule on the enforceability of a forfeiture condition, we would add that we see very little difference between enforcing an unreasonable forfeiture condition and enforcing an unreasonable covenant not to compete by way of damages, especially when the rights to be forfeited have been earned and vested. In fact, the enforcement of a forfeiture condition, representing liquidated damages, might be much less equitable to the extent that actual damages need not be proved.

provided by Durapin and still on lease by American, or any pins in American's possession not then yet leased, said net profits to be computed in the same manner as hereinbefore set forth." (Emphasis added.)

That right simply cannot be read as subject to a forfeiture condition, as American contends.

The real issue to be resolved is whether the trial justice properly invalidated the restrictive covenant as an unreasonable restraint of trade. American maintains that the provision was not unreasonable and should have been enforced.

■ The restrictive covenant involved here is clearly ancillary to a valid distributorship agreement and supported by adequate consideration, so the first issue we must decide is whether American had any legitimate interest to protect after the termination of its contract with Durapin. American, without being specific, makes the assertion that its property interests should "seem obvious." Presumably it refers to its February 1982 list of customers —80 percent of the duckpin market. In situations like the present one, this court will recognize a protectable interest in customer lists only if that list is confidential in nature, see *Callahan v. Rhode Island Oil Co.*, 103 R.I. 656, 660, 240 A.2d 411, 413 (1968), or if the promisor has become aware of the specific and otherwise unknown needs of a nonconfidential list of customers, such that a special relationship is formed between the promisor and the customer. *See Rego Displays, Inc. v. Fournier*, 119 R.I. 469, 474, 379 A.2d 1098, 1101 (1977).

Although dependent upon the particular facts, the ultimate question of whether a customer list justifies protection is ultimately one of law. *Eastern Distributing Co. v. Flynn*, 222 Kan. 666, 673, 567 P.2d 1371, 1378 (1977). Here there has been no evidence introduced that would support a finding that American could legitimately seek to protect its list of customers that included 80 percent of the duckpin market. The identity of all those customers was common knowledge. The National Duckpin Congress book lists all duckpin alleys in the country, making this customer information readily ascertainable to everyone in the bowling business. There is also no evidence in the record that Durapin had developed any special relationships with American's customers. In fact the record indicates that it was American alone who dealt with the customers. American had, therefore, no property interest in its nonconfidential list of customers, especially in light of the fact that the record indicates that the Durapin duckpin effectively sold itself.

■ The only protectable property rights that American had after the termination of its contract with Durapin were the actual leases it negotiated with its customers during the ten-year term of the contract, along with its share of the accompanying profits therefrom. American could legitimately seek to protect its interest in all leases that extended beyond the termination date of the distributorship agreement. However, it could not prevent Durapin from doing business with the customers themselves because they did not constitute a protectable interest.

■ Consequently the next issue is whether the trial justice properly held that the covenant sought to be enforced was unreasonable because it would impose an undue hardship on Durapin. We believe that this question must be answered in the affirmative. Again, the only legitimate interests that deserved protection were the outstanding leases, and so long as no lease was interfered with, there was no reason, aside from simply eliminating competition, to prohibit Durapin from using Fair Lanes as its new "distributor." To be sure, American was interested in preventing Durapin from leasing or selling pins to 80 percent of the duckpin market, thereby eliminating competition with the new American duckpin, but the desire to be free from competition, by itself, is not a protectable interest. *See Max Garelick, Inc.*, 105 R.I. at 149, 250 A.2d at 357. *See also Eastern Distributing Co.*, 222 Kan. at 671, 567 P.2d at 1376.

Had the trial justice granted the relief sought by American and enforced this covenant as written, she would have gone much further than was reasonably necessary to protect American's legitimate interest, violating the holding in *Koppers Products Co.*, 60 R.I. at 216–17, 197 A. at 445–46, and imposing an undue hardship on Durapin by completely excluding it from access to almost all segments of the very small duckpin market for a period of up to three years. Having in mind the scenario that was presented, we find that the restrictive covenant was unreasonable, Restatement (Second) *Contracts* § 188(1)(a) (1981), and that the Superior Court's finding in this regard was correct.

■ This declaration, however, does not complete our task, for the final issue to be resolved is whether the trial justice was correct when she refused to enforce the challenged covenant and invalidated it in toto. American maintains that the provision should not have been struck down in its entirety. Currently there are three approaches taken by courts when dealing with unreasonable restraints of trade. *Bess v. Bothman*, 257 N.W.2d 791, 794 (Minn.1977). Earlier decisions employed the "all or nothing" rule, which simply voided an unreasonable restraint in its entirety. *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 36 (Tenn.1984). More recent court decisions, however, reject this all-or-nothing rule in favor of some form of judicial modification. *Id.* Unreasonable restraints are modified by courts in either of two ways. *See Wood v. May*, 73 Wash.2d at 312–14, 438 P.2d at 590–91. Initially, courts adopted the so-called blue-pencil doctrine. According to this doctrine, a restraint's validity depends upon a mechanical-divisibility test whereby a covenant would be enforceable only if it remains grammatically meaningful after striking out any offending provisions. *Id.* at 313, 438 P.2d at 591. Recently the trend has been to abandon this blue-pencil rule in favor of a rule of partial enforcement. *Ingram*, 678 S.W.2d at 37; *see also* 14 *Williston on Contracts*, § 1647C at 296 (Jaeger 3d. ed.1972). Courts adopting this approach ignore the divisibility aspect and

exercise their inherent equity powers to modify and enforce covenants whether their phraseology lends itself to severability or not. *Wood v. May*, 73 Wash.2d at 313–14, 438 P.2d at 591–92. Under the partial-enforcement rule, unless circumstances indicate bad faith or deliberate overreaching on the part of the promisee, a court will attempt to modify an unreasonable covenant and enforce it to an extent that it is reasonably necessary to protect the promisee's legitimate interests, if that can be done without imposing undue hardship on the promisor or adversely affecting the public interest. *Ingram*, 678 S.W.2d at 37.

Through the years this court has not settled on any one of these three approaches. While the decision in *Max Garelick, Inc.* represents a clear rejection of the all-or-nothing rule in favor of some form of judicial modification, it was only a tentative and partial embrace of the blue-pencil doctrine. There the court emphasized that it was dubious from its past pronouncements whether a restraint would be enforced when the unreasonable portions of a restraint were not divisible from the reasonable portions. *See Max Garelick, Inc.*, 105 R.I. at 147–48, 250 A.2d at 357. As Chief Judge Francis J. Boyle of the Federal District Court of Rhode Island so aptly pointed out, this uncertainty still prevails in this jurisdiction, as we have still not yet ruled on whether an unreasonable covenant, which does not lend itself to blue-pencil modification, must be rejected in its entirety or whether it may be partially enforced to a reasonable extent. *Dial Media, Inc. v. Schiff*, 612 F.Supp. 1483, 1490 (D.R.I.1985).

■ We believe this is the appropriate time to choose the route that permits unreasonable restraints to be modified and enforced, whether or not their terms are divisible, unless the circumstances indicate bad faith or deliberate overreaching on the part of the promisee. The underlying principle behind this rule is that equity should not permit the injustice that might result from the total rejection of a covenant merely because the court disagrees with the

promisee's judgment about what restriction is necessary to protect the promisee's proprietary interests and that covenant's language does not lend itself to the mechanical blue-pencil modification. *Eastern Distributing Co.*, 222 Kan. at 675, 567 P.2d at 1379. We believe that partial and reasonable enforcement is certainly more equitable than total nonenforcement and also more consistent with our predecessors' holding in *Koppers Products* that courts should go no further than is reasonably necessary in order to protect the legitimate interests of the promisee. *See Wood v. May*, 73 Wash.2d at 312–14, 438 P.2d at 590–92. Partial enforcement should be applied in those instances wherein nothing is wrong with the agreement except that the parties have agreed on some restraint that is somewhat greater than required to protect the legitimate interests of the promisee. 6A *Corbin on Contracts*, § 1390 at 77 (1962).

In choosing to adopt the partial-enforcement approach rather than the blue-pencil doctrine, we note that the blue-pencil rule has also been rejected by the Restatement (Second) *Contracts* as being contrary to the weight of authority and strongly criticized by scholarly writers. Restatement (Second) *Contracts* § 184 reporter's note at 32; 6A *Corbin on Contracts* § 1390; 14 *Williston on Contracts,* § 1647C; Williston & Corbin, On the Doctrine of *Beit v. Beit,* 23 Conn. B.J. 40, 43–51 (1949). The critics emphasize that the blue-pencil rule is a purely mechanical device, emphasizing form over substance, which should not stand in the way of equity. *Wood v. May,* 73 Wash.2d at 312–14, 438 P.2d at 590–92; *see also Bess v. Bothman,* 257 N.W.2d at 795; *Solari Industries, Inc.,* 55 N.J. at 576–83, 264 A.2d at 56–59; 6A *Corbin on Contracts* § 1390 at 67–69.

█ Our adoption of the partial-enforcement approach does not, however, change the result reached by the trial justice in this dispute. Even under this approach a court will go no further in granting relief than is reasonably necessary to protect a promisee's legitimate interests. *See Koppers Products Co.,* 60 R.I. at 216–

17, 197 A. at 445–46. Where a promisor has not jeopardized the proprietary rights of the promisee, there is no need for the court to exercise its equity powers to modify and enforce an unreasonable noncompetition provision. Here American's only legitimate proprietary rights, the outstanding leases, were not in any way infringed upon by Durapin. Thus there was no need to modify and enforce the restrictive covenant contained in the American–Durapin agreement.

American's appeal is denied and dismissed. The judgment appealed from is affirmed, and the case is remanded to the Superior Court.