In re James T. GIVENS, Debtor.

Givens Marine Survival
Co., Inc., Plaintiff,

v.

James T. Givens, Defendant.

Bankruptcy No. 96–13585.
Adversary No. 97–1009.

United States Bankruptcy Court,
D. Rhode Island.

June 28, 2000.

Mark A. Pogue, Steven M. Kumins, Edwards & Angell, Providence, RI, Anthony T. Jackvony, Dimitri & Dimitri, Providence, RI, for Plaintiff.

Bruce P. Gladstein, Pawtucket, RI, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Here on the District Court's remand order requiring us to articulate the basis for our rulings on the following three points:

(1) That there exists a legitimate interest that the covenant not to compete is designed to protect. *See Durapin, Inc. v. American Prods., Inc.*, 559 A.2d 1051, 1053 (R.I.1989).

(2) That the terms specified in the injunction (e.g., the geographic scope, and the six-year period) were reasonably necessary, under the circumstances, to protect GMS's legitimate interests, and that they do not impose undue hardship on Givens or adversely affect the public interest. *See id.* at 1058.

(3) Whether the parties intended that any covenant not to compete would extend to repairing and/or servicing liferafts.

Remand Order, October 21, 1999, Docket No. 98.

In accordance with the instructions of the District Court, further hearings were held, and at our request the parties have filed proposed findings and conclusions. We will address the issues seriatim.

### BACKGROUND

Givens Marine Survival Company, Inc. ("GMS") was created in November 1995 by James T. Givens ("Givens") and Frank Perrino, for the purpose of acquiring the assets and running the business of Givens Ocean Survival Systems, Inc. ("GOSS"), a company formally owned and operated by Givens. GOSS sold and serviced a buoy-stabilized life raft which Givens had invented and patented. The raft was commonly known as the Givens Buoy Survival Raft ("the Raft"), and through GOSS, Givens, who had been selling and servicing the Raft for many years, was a household name in the industry and among its consumers.

The Givens/Perrino agreement[1] was memorialized in two documents—(1) a letter agreement from Givens to Perrino dated November 14, 1995; and (2) a Bill of Sale and Assignment. In the letter agreement Givens promised: (i) "to transfer all my rights and ownership interests in and to the [Raft] and in and to [GOSS] or its assets" to the new company; and (ii) "not [to] take *any* known." See Plaintiff's Exhibit 1, at 1–2 (emphasis added). The Bill of Sale confirms and mirrors the terms of the letter agreement. See Plaintiff's Exhibit 2.

In exchange for transferring these assets to GMS, Givens was named president of GMS and he received 350,000 shares of stock in the new company. For his 350,000 shares, Perrino paid no cash, he assumed a number of GOSS/Givens liabilities totaling $128,000, as well as the cost of startup and operation of the new business. *See* Minutes of GMS, Inc., Nov. 29, 1995, Exhibit 8.

### Findings of Fact as to whether the Covenant Not to Compete is Designed to Protect a Legitimate Interest

1. Givens is the inventor of the Raft.

2. Givens has been selling and manufacturing the Raft for approximately 25 years, during which time he has sold more

---

**1.** Both parties were represented by counsel during their contract negotiations.

than 5,000 units. See Transcript, Feb. 7, 1997, at 93, 164.

3. Givens is known internationally in the field, and his name is widely associated with the Raft by both consumers and the United States Coast Guard. Therefore, considerable goodwill is associated with the name "Givens".

4. GOSS conveyed the trade name "Givens" to GMS, and the right to use that name is one of GMS's most valuable assets.

5. After contracting with GMS, wherein he agreed not to compete, Givens continued to sell Rafts other than for the benefit of GMS. See Transcript, Feb. 7, 1997, at 74.

6. There is a "great deal of confusion" in the marketplace for the Raft, regarding which company has the right to sell the Raft and use the "Givens" trade name. See Transcript, Feb. 7, 1997, at 93. Much of this confusion has been wrongfully and intentionally caused by Givens, who continued to advertise Rafts through a variety of fictitious and/or shell companies, trading on the name "Givens". See Transcript, Feb. 7, 1997, at 35–93.

7. Givens admitted that by attempting to retain control over the Raft servicing network, he was competing against GMS. See Transcript, Sept. 2, 1997, at 13.

8. In a letter to the repair stations servicing the Raft, Givens made a number of misrepresentations, including: (1) that Givens had the "exclusive right" to "control ... all inspected and non-inspected life rafts;" (2) that "all technical questions relating to the servicing of life rafts will be answered by Jim Givens only;" and (3) that inspection certificates for "all life rafts" had to be obtained from Givens. See Plaintiff's Exhibit 32 Letter from Givens to "Customer" dated June 26, 1997, and Exhibit 37 Givens' Letter to "All Givens Approved Service Stations" dated August 12, 1997.

9. Shortly after the issuance of the Preliminary Injunction on March 17, 1997, Givens formed a company, through his former wife, Meredith Russo, called "Givens Buoy Life Raft Co." This company then issued a press release containing a photograph of James Givens, stating that Givens Buoy Life Raft Co. is "not responsible for any product failure that may occur with other [Raft] manufacturers using the Givens name." See Plaintiff's Exhibit 36.

10. Although he has a substantial ownership interest in GMS, Givens is actively discouraging people from investing in GMS, and from buying or using GMS products, all in violation of the sale covenants.[2] See Transcript, Feb. 7, 1997, at 100.

11. GMS is a start-up operation which relies very heavily on Givens' patents and plans for its viability. In disregard of his agreement, Givens refused to turn over the blueprints for building the Raft, as well as the Coast Guard approval certificates. See Transcript, July 8, 1997, at 71–72. As a result, GMS had to laboriously and expensively reverse-engineer each model Raft in order to develop necessary building plans. *Id.* Additionally, when Givens left the company, GMS was required to develop a new sales force from scratch, and to find new dealers and distributors. These obstacles, including the litigation, all improperly created by Givens, have cost GMS over $200,000. See Transcript, July 8, 1997, at 73–75. Other obstacles that GMS has had to overcome are Givens' negative public comments, Givens-created marketplace confusion, and his efforts to dissuade potential GMS investors. See Transcript, July 8, 1997, at 89.

12. As a result of Givens' conduct, GMS has only been able to sell about 14 Rafts per year. See Transcript, July 8, 1997, at 86–87.

---

**2.** These findings are all based upon the evidence as of September 23, 1997. Since that time we have been advised that Mr. Givens's health has declined, and we therefore make no reference herein to his present level of interference with GMS.

13. Givens himself estimated that it would take GMS at least three years to increase its sales above 14 Rafts per year. See Transcript, July 8, 1997, at 88–89.

14. GMS's development has been severely delayed primarily due to Givens' intentional violations of the covenant not to compete, including his misrepresentations made throughout the recreational boating community.

### Conclusions of Law as to whether the Covenant Not to Compete is Designed to Protect a Legitimate Interest

■ For a covenant not to compete to be enforceable there must be a legitimate interest that the provision is designed to protect. See Durapin, Inc. v. American Prods., Inc., 559 A.2d 1051 (R.I.1989).

> The protectible interest which a buyer procures through a restrictive covenant ancillary to a sale of assets originates either in the good will of the business sold or the confidential information used in its operation: When a business is sold, restraints may be imposed to protect the value of the good will transferred, and where specialized knowledge, such as secret processes or the like are involved, restraints may protect against the competition resulting from disclosure or appropriation.

Marathon Petroleum Co. v. Chronister Oil Co., 687 F.Supp. 437, 439 (C.D.Ill.1988); see also Novus Franchising, Inc. v. Taylor, 795 F.Supp. 122, 127–29 (M.D.Pa. 1992). When a company acquires the assets of another, it acquires that company's goodwill, even if this is not explicitly stated in the agreement. See Winn–Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 681–82 (5th Cir.1971); Patterson v. Commissioner of Internal Revenue, 810 F.2d 562, 569 (6th Cir.1987).

■ In the instant case, Givens' covenant not to compete was clearly intended to protect for GMS the positive goodwill that Givens and GOSS had developed over several decades of manufacturing, selling and servicing the Raft, and the name recognition associated with the Givens' name was a substantial asset which, when transferred, gave GMS a protectible interest therein. By contacting his prior customer base for the purpose of competing against GMS, and by making derogatory statements about GMS, Givens damaged the goodwill which he had transferred to GMS, and in which GMS had a protectible interest.

Another business interest which is protected by a covenant against competition is that which protects a company from competition by someone with insider knowledge of confidential customer information. See Marathon Petroleum, 687 F.Supp. at 439; Central Water Works Supply, Inc. v. Fisher, 240 Ill.App.3d 952, 181 Ill.Dec. 545, 608 N.E.2d 618, 623 (1993).

Clearly, GMS has a legitimate interest in protecting itself against competition from Givens, who had the ultimate insider's knowledge of GMS's business, as well as knowledge of GMS's Raft customer list, which is proprietary information. Givens also knew GMS's servicing network and he exploited this insider knowledge to compete (unfairly) against GMS, all in violation of the interest Givens agreed to protect.

### Findings of Fact Concerning Whether the Terms of the Injunction were Reasonable

As background, Givens' original covenant not to compete was unlimited in time and in geographic scope. See Plaintiff's Exhibits 1 and 2. After our ruling that Givens was enjoined from violating this covenant, a hearing was held on July 8, 1997, for the specific purpose of determining the scope of the covenant and to ensure that it would neither impose undue hardship on Givens nor adversely affect the public interest.

At that hearing GMS argued that the restriction against competition should last for ten years and should apply worldwide. See Transcript, July 8, 1997, at 76, while Givens argued that a short, limited, re-

striction was appropriate. With respect to the impact of the restriction on Givens, GMS pointed out that Givens remained free to engage in the service business from his location at Lagoon Road in Portsmouth, Rhode Island; moreover, GMS did not object to Givens engaging in ancillary raft business, including the design, manufacturing, and sale of a tether raft. After hearing this evidence, we reduced the period of non-competition to six years, but left the geographic scope unchanged.

### Findings of Fact Concerning the Reasonableness of the Terms of the Injunction

1. GMS is a startup company in precarious financial condition. See Transcript, July 8, 1997, at 74–75.

2. GMS is very dependent upon the goodwill, including the favorable reputation associated with the Givens name, which it acquired from GOSS. See Plaintiff's Exhibit 2.

3. GMS is not likely to survive if Givens, with his insider knowledge, is allowed to compete during the start up period.

4. In light of GMS's precarious financial condition, and because Givens has acted willfully to frustrate and to damage Perrino and GMS, unfairly and in violation of the contract, it will take a number of years before GMS is viable, even in the absence of future competition by Givens. *See* Transcript, Hearing July 8, 1997, pp. 87–88.

5. Serious obstacles created by Givens to GMS becoming a viable business, include: (a) GMS has not received the blueprints for building the Raft or the Coast Guard Approvals, as agreed between the parties. See Transcript, July 8, 1997, at 71–72. As a result, GMS has had to laboriously and expensively reverse engineer each model Raft in order to develop its own buildable plans from scratch. *Id.* GMS has also been forced to expend time and money to obtain Coast Guard certificates of approval to build and market the raft. Perrino testified that, based upon what Givens told him, the Coast Guard approval process would take five to six years and would cost over $100,000. *Id.* at 71; (b) Because Givens is not working for the company, as promised, *id.* at 73, GMS has had to develop its own sales force. *Id.;* (c) GMS will have to overcome negative comments, marketplace confusion, and the many efforts made by Givens to dissuade potential customers and investors from doing business with GMS; (d) The life raft industry is becoming increasingly competitive and, combined with the negative comments made by Givens about GMS, a significant period of time will be required for GMS to get up to speed. See Transcript, July 8, 1997, at 89. As a result of all this, GMS has debts of several hundred thousand dollars, but has generated only limited sales. See Transcript, July 8, 1997, at 74–75.

6. At the time of the hearing in 1997, GMS was selling only about 14 Rafts per year. See Transcript, July 8, 1997, at 36–37.

7. Givens himself estimated that it will take GMS more than three years to increase its sales above 14 Rafts per year. See Transcript, July 8, 1997, at 89.

8. GMS's development has been hampered by Givens' failure and/or refusal to comply with his covenant not to compete.

9. GMS's development has also been severely retarded by the misrepresentations made by Givens about GMS.

10. The market for the Raft is worldwide.

11. Under the terms of the non-competition agreement, Givens remains free to engage in activities related to the Raft, from his Lagoon Road location in Portsmouth, Rhode Island.

12. Under the terms of the non-competition agreement Givens is free to engage in water safety business activities unrelated to the Raft.

13. Even prior to the parties' agreement, the company through which Givens was selling Rafts, GOSS, was not serving the public interest, in that it was selling Rafts to consumers, keeping the deposits and failing to deliver Rafts. This (mal)practice was so prevalent that Givens maintained a list of so-called "Hot Rafts" which consisted of customers who had paid for, but not received Rafts.

14. By bypassing GMS and selling the Raft directly to customers, and creating confusion in the market by making negative comments about GMS and its product, Givens has damaged and reduced the value to GMS of the Givens' name.

15. The non-competition agreement was not intended to apply to Givens' servicing operation at 137 Lagoon Road in Portsmouth, Rhode Island. See Transcript, February 4, 1997, pp. 25–26, and Transcript, August 28, 1997, at 68.

16. Givens has patented and manufactured a tether which is used as an accessory to the Raft. See Transcript, July 1, 1997, at 128; Transcript, July 8, 1997, at 94. He remains free to manufacture and to market this tether, *id.*, unhampered by the non-competition covenant.

17. Givens is contemplating entering the market for survival gear other than the Raft, including the market for canisters, brackets, and food and water supplies. The non-competition covenant does not prevent Givens from engaging in this type of activity. See Transcript, July 8, 1997, at 95–96.

18. Givens is also planning to sell and to service "non-survival," i.e., recreational rafts. *Id.* In particular, his longtime business partner, RPR Industries, manufactures an inflatable raft that does not compete with the Raft. The non-competition agreement does not prevent Givens from selling non-survival rafts. See Transcript, July 8, 1997, at 96.

### Conclusions of Law Concerning the Reasonableness of the Terms of the Injunction

■ It is because of all of the foregoing that the enforcement of Givens' non-competition agreement on a worldwide basis for a six year period is reasonably necessary to protect GMS's legitimate business interests. In view of the fact that Givens has already been competing against GMS, has intentionally created much customer confusion designed to hurt GMS, has reduced the value of the Givens' name to GMS by making negative comments throughout the industry, has failed to turn over manufacturing plans for the Raft to GMS, and has actively discouraged people from investing in GMS, GMS requires a period of *at least* six years of freedom from interference by Givens within which to develop the business. Much of the damage referenced above may be irreparable.

Enforcement of the non-competition agreement on a worldwide basis for a six year period will not impose an undue hardship on Givens, because he remains free to: sell the Raft from his location in Portsmouth, Rhode Island, to service the Raft from that location, to manufacture and market the tether, and to manufacture and sell non-survival rafts and accessories for the Raft itself. Enforcement of the non-competition agreement on a worldwide basis for a six year period will promote—not adversely affect—the public interest. Confusion in the market place will be diminished, and purchasers of the Raft will receive their merchandise without concern that it may not be the original Givens Buoy Life Raft.

### The Parties DID NOT Intend that Their Covenant Not to Compete Would Extend to Repairing and/or Servicing the Rafts

Finally, we conclude that the parties did not intend the covenant against competition to extend to Givens' ability to service or repair the Raft. On direct examination by Mr. Pogue, Perrino testified as follows:

Q: You mentioned in response to one of the Judge's questions that GOSS, this company Mr. Givens was operating when he approached you, was dealing with servicing of rafts. Do you remember him saying that?

A: That's right.

Q: What did you mean by "servicing rafts"?

A: Inspecting rafts. Every year the rafts have to be reinspected so that they would be serviceable, and Jim Givens had a service center down there in Portsmouth, Rhode Island inspecting those rafts.

Q: Okay. And was that a part of what was being conveyed from Givens to GMS, this service center operation?

A: No, it was not.

Transcript, February 4, 1997, at 26–27.

Clearly, Givens' servicing center in Portsmouth was not part of the assets transferred to GMS. Here we must add one caveat, however. Under GOSS there were over one hundred service stations nationwide, and to service the Raft they had to be "certified" by GOSS/Givens. After the transfer of the GOSS assets to GMS, Givens claimed, and advertised, that he (and *only* he) retained the right to certify the individual service centers. We disagree, and rule that the authority to certify Raft service centers was transferred to GMS, and that GMS, and not GOSS or Givens, has the sole right to certify the service centers.

Having, hopefully, complied with the Remand Order, these findings and conclusions are returned to the District Court to assist in deciding the pending appeal.