DECISION
This matter is before the Court on the complaint of Richard Hawkins (Hawkins) alleging the breach of an employment and stock option agreement by his former employer, daly.commerce, inc. d/b/a Daly Wolcott, Inc. (Daly). Hawkins seeks the balance of payment under the agreement, along with attorney fees. Daly, in turn, has counterclaimed, alleging that Hawkins breached a non-competition clause in the agreement, thereby justifying its nonpayment.[1]
The short relationship between the parties began in 1996 when Hawkins did some consulting work for Daly's growing computer software company. Thereafter, they negotiated an employment contract which included, among other things, provisions for Hawkins' compensation if he were terminated without cause. Then on May 14, 1998, Daly notified Hawkins of the termination of his employment. With these events, the seeds of this litigation were planted. The parties, through their attorneys have stipulated to a number of facts; presented testimony and introduced exhibits over a five day trial; and, then submitted post-trial briefs and replies thereto.[2]
 ISSUES PRESENTED
Hawkins submits that if he were terminated without cause he was to receive a severance that included six months salary, totaling $75,000 (paid over a six month period), along with an amount equal to the gain he would have earned had he been able to exercise his stock option at the time of termination. The latter amount was calculated by the parties at $531,174.84 and payable in three yearly installments.[3] Hawkins notes that after termination he, in fact, received the 6 months of salary and the first installment of the "gain" when, with no reason given, Daly ceased further payments. After making demands, he could only learn that he had not done enough to entitle him to the remainder. Hawkins now seeks the balance of the installments, plus interest and attorney's fees pursuant to § 9-1-45 of the General Laws of Rhode Island.[4]
Daly argues that the severance package of 6 months salary and the gain on the stock option were consideration for the agreement's non-competition clause and, further, that Hawkins breached that clause by doing work for Complete Business Solutions, Inc., a computer consulting firm now known as Covansys (Covansys). It contends Covansys was a competitor of Daly in that it either implemented software that was in direct competition with Daly or because Covansys sent Hawkins to work at American Power Conversion (APC), thus preventing Daly's potential sale of its software to APC. Although it only learned of this work by Hawkins in October 2002 as a result of discovery in preparation for this trial, Daly contends that it legitimizes its earlier decision to stop paying Hawkins. As such, Daly seeks a refund of both the 6 months of salary, as well as the first installment of the "gain."[5]
 ARGUMENTS MADE
The thrust of the arguments centers around the interpretation of paragraphs 10(b), (c) and (e) and 12(a) and (b) of the Employment and Stock Option Agreement. Paragraph 10(b) provides the mechanism for payment to Hawkins on his termination without cause. It includes payment of his base salary for six months following termination, along with an amount equal to the gain he would have made on exercising his stock option at the time of termination. This amount was to be paid in three installments as set out in 10(b)(ii). Paragraphs 12(a) sets forth a non-competition clause for a period of 24 months preventing Hawkins, without prior written consent, from engaging in "any business venture . . . of the type and character engaged in . . . ." by Daly. Paragraph 12(b) provides the damages for a breach of the non-competition clause.
Hawkins argues that the agreement was drafted by Daly's attorneys, Edwards and Angell, and thus should be construed against Daly. He contends that his layperson suggestion to change the term "similar" in paragraph 12(a) to "type and character" did not shift the burden of interpretation to him. He also argues that in interpreting the term, "type and character," a narrow meaning must be given, especially since it is found in a non-competition clause the goal of which should be the aimed need of the employer and not the deprivation of the employee's right to work. In support of such an interpretation, he notes that Daly's function was to develop and market packaged Supply Management Software (SCM) and the implementation of same in a customer's computer system. As such, any work he did through Covansys at American Power Conversion was far outside the scope of the term "type and character." He points out that his relationship with Covansys was not that of employer-employee, but rather as an independent contractor who was then loaned out to APC. Additionally, he states that Covansys was not of the "type and character" as Daly. It did not develop SCM software; and while it may have implemented software of two of Daly's competitors (Peoplesoft and SAS), this was insufficient to make Covansys a competitor of Daly. Further, Hawkins submits that any work he did at APC was totally unrelated to the "type and character" of Daly. He notes that nothing was presented at trial to prove he ever worked on an SCM system there. Rather, his work was to certify that APC's Star repair system was Y2K compliant. This was not the kind of work envisioned by the parties when they used "type and character" in the non-competition clause. Hawkins ridicules Daly's suggestion that someone working on APC's repair software for Y2K readiness would be the kind of person who would then suggest Daly's SCM software to them as an alternative.
In support of his position that a non-competition clause and the term "type and character" should be narrowly construed, he cites authority that such provisions "will only be enforced when reasonable and where the restrictions do not extend beyond what is apparently necessary for the protection of the employer's business" Plaintiff's Post-Trial Brief at 11 (citing Block v. Vetcor of Warwick, L.L.C., C.A. 99-0970, May 19, 2000, Williams, J.); Iggy's Doughboys, Inc. v. Giroux, 729 A.2d 701 (R.I. 1999)); and "`where a promisor has not jeopardized the proprietary rights of the promisee, there is no need for the Court to exercise its equity power to modify and enforce an unreasonable noncompetition provision.'" Plaintiff's Post-Trial Brief at 24 (citing Durapin, Inc. v. AmericanProducts, Inc. 559 A.2d 1051, 1059 (R.I. 1989)).
Alternatively, Hawkins argues that even if there were a breach, it was not material. Applying the facts of this case to the test set out in the Restatement of Contracts,[6] he argues that any breach would not be material, especially since Daly did not sustain any damages proximately caused by it.[7]
In his final alternative, Hawkins argues that the consideration for the non-competition clause was the 6 month salary continuation and not the gain he was entitled to had he been able to exercise his stock option. Since the consideration for the latter was Hawkins originally going to work for Daly, it should still be enforced, even if he breached the non-competition clause.
On the other hand, Daly contends that the term, "type and character," was suggested by Hawkins and, thus, must be interpreted against him. Hawkins was not some innocent going against a corporate power and its highly regarded law firm, but rather a sophisticated and experienced businessman who knew exactly what he was doing. Further, since Hawkins in a later memo to Daly used the word "similar field" in reference to the non-competition clause, the term "type and character" should be given its broader meaning. That meaning would have made Hawkins' relationship with Covansys of the same type and character as that of Daly, thereby causing a breach of the non-competition clause.
Next Daly argues that any breach of the non-competition clause was material. In its Post-Trial Brief, it states:
 "Courts have consistently recognized that the violation of a covenant not to compete constitutes a material breach of contract . . . . To constitute a material breach, the breaching party's conduct in violation of a non-compete provision need not be willful, need not be of substantial benefit to the breaching party and need not result in harm to the former employer. National Propane Corp. v. Miller, 18 P.3d 782 Colo. App. 2000." Defendant's Post-Trial Brief at 22.
To Daly, Hawkins' relationship with Covansys caused a material breach — either because Covansys was the same type and character as Daly in that it implemented software of two competitors, Peoplesoft and SAS,
or because by going to work at APC through Covansys, Hawkins prevented APC from a possible purchase of its software. Further, Daly suggests both from case law, as well as the agreement between the parties, that a material breach exists even if the conduct resulted in no economic harm or loss to the beneficiary of the agreement. Defendant's Post-Trial Brief at 24 (citing Electrical Distributors, Inc. v. SFR, Inc., 166 F.3d 1074
(10th Cir. 1999); also Employment Agreement ¶ 12(b) (stating that Daly "would suffer irreparable injury on proof of violation entitling Daly to injunctive relief in addition to whatever other legal or equitable remedies may be available")). Daly next argues that even though it only learned of Hawkins' alleged competition in October 2002, this still justifies its prior decision of May 1998 not to pay the last two installments of the employment contract. It cites the after-acquired evidence doctrine that "one party's material failure of performance has the effect of the nonoccurrence of a condition of the other party's remaining duties . . . even though that other party does not know of the failure." Defendant's Post-Trial Brief at 26. Finally, Daly contends that the consideration for the promise not to compete was both the 6 month salary continuation, as well as the "gain" on the exercise of the option, and, as such, all payments made to date should be returned to it as damages in its counterclaim.
 ANALYSIS AND FINDINGS
After hearing the testimony presented, reviewing all of the exhibits introduced, and reading the transcript, as well as the Post-Trial Briefs, this Court makes the following findings:
 1. Despite Hawkins' suggestion of the more specific term, "type and character," instead of the word, "similar," there is no doubt that the entire agreement, as well as this term, was drafted by Daly. As such, any ambiguous language in the contract must be construed against the drafter of that language. "If the language supplied by one party is reasonably susceptible to two interpretations, one of which favors each party, the one that is less favorable to the party that supplied that language is preferred." Defendant's Post-Trial Brief at 16 (citing II E. Allen Farnsworth, Farnsworth on Contracts, § 7.11, at 518 (2nd Ed. 1998)). In these negotiations, Daly was represented by a premier Rhode Island law firm, while Hawkins, with no legal training, represented himself. In his response to Paragraph 12 of the first draft of the agreement, Hawkins suggested: ". . . entity which is in a business similar to that of the Employer is to [sic] broad. How about `of the type and character engaged in by the employer.'" Exhibit 9. This suggestion was then adopted by Edwards and Angell, which never did anything to define the term further. To argue that this term must be read against Hawkins simply because he made a suggestion would then mean that any time a comment was made to a proposed contract, the burden of interpretation would shift to that party. This Court finds that the clear and overwhelming position of Daly and its attorneys, and its adoption of the suggestion without using its expertise to further explain it, does not shift the burden of interpretation from Daly when an ambiguity was found.
 2. The work performed by Hawkins through Covansys was not for a business venture or entity of the type and character engaged in by Daly. American courts have long held that non-competition provisions are regarded with disfavor and therefore subject to careful judicial scrutiny. Such provisions will only be enforced when reasonable and where restrictions do not extend beyond what is apparently necessary for the protection of the employer's business. Plaintiff's Post-Trial Brief at 11 (citing Durapin, Inc. v. American Products, Inc. and Iggy's Doughboys, Inc. v. Giroux, supra). Clearly, if Hawkins had gone to work for Peoplesoft or SAS, without Daly's written approval, a violation of the non-competition clause would have occurred. However, by aligning himself with Covansys, he did not do this. Daly developed and implemented packaged SCM software. Covansys was a computer consulting company that implemented many packaged softwares, including two of Daly's competitor software, Peoplesoft and SAS. In no way was Covansys a competitor with Daly since it was not an entity of the type and character of Daly. Likewise, the work done by Hawkins at APC was not violative of the non-competition clause. Covansys, treating Hawkins as an independent consultant, loaned him to APC to get its Star Repair software Y2K compliant. Nothing but speculation would support Daly's argument that this was competition envisioned by Paragraph 12 of the agreement. The work done was not on APC's SCM software. To argue that somehow this work could have resulted in Daly's eventually placing its SCM software at APC, suggests that no matter what Hawkins did in the computer field after termination would have been considered a violation of the non-competition clause. As argued by Hawkins, if in fact his work at APC was on SCM software, Daly could have easily subpoenaed APC, a Rhode Island corporation, to verify it.[8] Put plainly, concluding that Covansys was of the type and character of Daly is like comparing apples to oranges. They differed so much that no reasonable person would have expected the work done by Hawkins to come close to violating paragraph 12. To prevent Hawkins from doing what he did, without permission, would have essentially eliminated him from his trade.
 3. This Court accepts and adopts Hawkins' definition of material breach as set forth in the Restatement of Contracts, as well as his interpretation of the facts as they apply to that definition, and in so doing concludes that there was no material breach of the non-competition clause by Hawkins in his dealings with Covansys and APC; and because of the clear distinction between the work done and the type and character of Daly, it finds there was no breach at all.
 4. While the above findings make reference to the after-acquired evidence doctrine cited by Daly somewhat academic, the Court finds that it was developed for those cases where employee misconduct was unknown at the time of employer discharge. It was not intended as a grab bag from which the employer could blindly hope to pluck out an excuse for its actions.
 5. The date of Hawkins' termination was July 13, 1998. The agreement required that Daly give Hawkins 60 days advance written notice of termination. This was done by Daly on May 14, 1998 in a letter stating, "this serves as notification of your termination of employment . . . ." Another letter from Daly sets the date of termination at July 13, 1998 (Plaintiff's Ex. 17); and if there were any doubt as to the correct date, it was erased by Daly's first installment payment being made on July 13, 1999.
 6. This Court rejects Hawkins' request for attorney's fees under G.L. 1956 § 9-1-45. Although the Court has certainly expressed its concern as to the 10 basis for Daly's denial of payment and the lateness at which it came up with it, it is not convinced that Daly's conduct and its defense showed a complete absence of a justiciable issue of either law or fact. UXB Sand Gravel v. Rosenfeld, 641 A.2d 75 (R.I 1994). While the Court has found that Hawkins did not breach the non-competition clause, it is satisfied that Daly presented sufficient justiciable issues to avoid the sanctions of § 9-1-45.[9]
Accordingly, judgment shall enter for Hawkins in the amount of $398,381.14, plus interest[10] and costs. Daly's counterclaim is denied and dismissed.
Counsel shall prepare an appropriate order for entry.
[1] Daly seeks to amend the counterclaim to award it the return of the $75,000 severance payment and first installment of the so-called "gain" on the stock option. In light of the Court's decision, this request is academic.
[2] The Court wishes to acknowledge the professionalism of all the attorneys and their assistance to the Court as it heard and decided this case.
[3] The installments were to be as follows: $132,793.71 on July 13, 1999; $132,793.71 on July 13, 2000; and $265,587.43 on July 13, 2001.
[4] At various points, the plaintiff has erroneously referenced other sections of the General Laws when referring to these fees.
[5] See 1 n. 1.
[6] In its 1994 review of a Rhode Island school administrator's employment contract, the First Circuit anticipated in dicta that Rhode Island would adopt the five factors listed in the Restatement for gauging the materiality of an alleged breach of a covenant not to compete:
 a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
 b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
 c) the extent to which the party failing to perform or offer to perform will suffer forfeiture;
 d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
 e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing . . . Gibson v. City of Cranston, 37 F.3d 731, 737, n 7 (1st Cir. 1994) (citing 2 Restatement (Second) Contracts § 241 (ed. 1979)).
[7] In support of the breach being immaterial, Hawkins points out that Daly didn't even learn of it until October 2002.
[8] Ironically, at some point Covansys had placed two computer programmers with Daly, and Daly did not consider Covansys a competitor in that context. Tr. at 210.
[9] Enacted originally to prevent the use of delay in book account actions where parties with no defenses filed answers to delay judgment, its expansion has been argued by attorneys whose true remedy is to include a provision for attorney's fees in the original contract or to have a clear expansion of the statute enacted by the legislature.
[10] Interest shall be calculated consistent with the method set forth in the second paragraph of Plaintiff's Post-Trial Brief at page 32.